11/10/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Ruben Tamez

D-1-GN-25-009963

No. ___________

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN and NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as a Representative of BLAKELY MCCRORY, Deceased, | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, | § | 455TH, DISTRICT COURT |
| Defendants. | § | ____ JUDICIAL DISTRICT |

**ORIGINAL PETITION**

Plaintiffs Warren and Patricia Bellows, Individually and as Representatives of Anna Margaret Bellows; Blake and Caitlin Bonner, Individually and as Representatives of Lila Bonner; Matthew and Wendie Childress, Individually and as Representatives of Chloe Childress; Ryan and Elizabeth DeWitt, Individually and as Representatives of Molly DeWitt; John and Andrea

Copy from re:SearchTX

Ferruzzo, Individually and as Representatives of Katherine Ferruzzo; Ben and Natalie Landry, Individually and as Representatives of Lainey Landry; and Lindsey McCrory, Individually and as Representative of Blakely McCrory, bring this action against defendants Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; Mystic Camps Management, LLC; George Albritton ("Britt") Eastland, as Representative of the Estate of Richard Eastland, Deceased; Willetta Eastland; Edward Eastland; and Mary Liz Eastland. Based on actual knowledge as to themselves and their own acts and omissions, and on information and belief as to all other persons and matters, plaintiffs respectfully allege as follows:

## INTRODUCTION

Youth camps are a long-cherished tradition across our State. These camps can provide an invaluable experience for young people to make lifelong friendships, safely enjoy the beauty of nature, and simply spend time free from everyday worries. But this ideal exists *only* when youth camp operators take reasonable and required precautions to ensure the safety of children and counselors invited to their camps. When they fail to do so, tragedy is sure to follow.

Just such a tragedy hit our State on July 4, 2025, when 25 campers and two camp counselors needlessly and tragically died in the flood waters at Camp Mystic.

These young girls died because a for-profit camp put profit over safety. The Camp chose to house young girls in cabins sitting in flood-prone areas, despite the risk, to avoid the cost of relocating the cabins. The Camp chose not to make plans to safely evacuate its campers and counselors from those cabins, despite state rules requiring evacuation plans, and not to spend time and money on safety training and tools. Instead, the Camp chose to assure its campers and counselors that these cabins are built on "high, safe locations." And the Camp chose to order its campers and counselors, as a matter of policy, to stay in these flood-plain cabins regardless of life-threatening floods.



Copy from re:SearchTX

On July 4, the Camp chose to take no steps to protect its campers and counselors while it knew a storm and "life threatening flash flooding" were approaching. Instead, with the river rising, the Camp chose to direct its groundskeepers to spend over an hour evacuating camp equipment, not its campers and counselors. The Camp chose not to evacuate its campers and counselors, even as floodwater reached the cabins, until counselors demanded it. Even then, the Camp chose *not* to evacuate the Bubble Inn and Twins cabins when other campers and counselors had been moved to safe, higher ground just 300 feet away. Instead, the Camp chose to order its campers and counselors to *remain* in the Bubble Inn and Twins cabins while the flood waters overwhelmed the camp. Finally, when it was too late, the Camp made a hopeless "rescue" effort from its self-created disaster in which 25 campers, two counselors, and the Camp director died.

Richard Eastland told the *Austin-American Statesman* 35 years ago, "I'm sure there will be other drownings. People don't heed the warnings." His words were about another camp tragedy, but they proved true about Camp Mystic. The Camp ignored warnings about the risky location of its cabins. It ignored warnings about the approaching July 4 storm and life-threatening flood risks. It ignored the obvious and rising flood risks that morning as the hours passed. It ignored warnings from its own counselors to evacuate the cabins. It simply ignored the unmistakable safety threat to its campers and counselors until this tragedy was unavoidable. And 27 young girls lost their lives.

Today, campers Margaret, Lila, Molly, Lainey, and Blakely should be third graders, and counselors Chloe and Katherine should be freshmen at the University of Texas. They all are gone. And while their families struggle with their loss, the Camp's actions since the tragedy have only deepened the pain. From the Camp's initial false notices that girls were "unaccounted for" to its recent announcements about reopening for business as usual while a camper is still missing, the Camp has caused further trauma to these distraught families. And through it all, the Camp refuses



Copy from re:SearchTX

to accept any responsibility for its actions and failures to act, defiantly blaming this tragedy on "an act of God" that no responsible steps could have avoided.

Forced to grieve the needless deaths of 25 campers and two counselors – now Heaven's 27 – plaintiffs bring this suit to ensure that the full truth will be revealed, all responsible parties will be held accountable, and yet more preventable youth camp tragedies involving other innocent children in the future may be averted.

## DISCOVERY LEVEL

1. Based on the relief sought, discovery should be conducted under a Level 3 plan pursuant to TEX. R. CIV. P. 190.4.

## PARTIES

2. Plaintiff Warren Bellows is an individual residing in Harris County.

3. Plaintiff Patricia Bellows is an individual residing in Harris County.

4. Plaintiffs Warren and Patricia Bellows, as Representatives of the Estate of Anna Margaret Bellows, Deceased, are individuals that reside in Harris County. At the time of her death, Anna Margaret Bellows resided in Harris County. No administration of her estate is pending, and none is necessary.

5. Plaintiff Blake Bonner is an individual residing in Dallas County.

6. Plaintiff Caitlin Bonner is an individual residing in Dallas County.

7. Plaintiffs Blake and Caitlin Bonner, as Representatives of the Estate of Lila Bonner, Deceased, are individuals that reside in Dallas County. At the time of her death, Lila Bonner resided in Dallas County. No administration of her estate is pending, and none is necessary.

8. Plaintiff Matthew Childress is an individual residing in Harris County.

9. Plaintiff Wendie Childress is an individual residing in Harris County.



Copy from re:SearchTX

10. Plaintiffs Matthew and Wendie Childress, as Representatives of the Estate of Chloe Childress, Deceased, are individuals that reside in Harris County. At the time of her death, Chole Childress resided in Harris County. No administration of her estate is pending, and none is necessary.

11. Plaintiff Ryan DeWitt is an individual residing in Harris County.

12. Plaintiff Elizabeth DeWitt is an individual residing in Harris County.

13. Plaintiffs Ryan and Elizabeth DeWitt, as Representatives of the Estate of Molly DeWitt, Deceased, are individuals that reside in Harris County. At the time of her death, Molly DeWitt resided in Harris County. No administration of her estate is pending, and none is necessary.

14. Plaintiff John Ferruzzo is an individual residing in Harris County.

15. Plaintiff Andrea Ferruzzo is an individual residing in Harris County.

16. Plaintiffs John and Andrea Ferruzzo, as Representatives of the Estate of Katherine Ferruzzo, Deceased, are individuals that reside in Harris County. At the time of her death, Katherine Ferruzzo resided in Harris County. No administration of her estate is pending, and none is necessary.

17. Plaintiff Ben Landry is an individual residing in Harris County.

18. Plaintiff Natalie Landry is an individual residing in Harris County.

19. Plaintiffs Ben and Natalie Landry, as Representatives of the Estate of Lainey Landry, Deceased, are individuals that reside in Harris County. At the time of her death, Lainey Landry resided in Harris County. No administration of her estate is pending, and none is necessary.

20. Plaintiff Lindsey McCrory is an individual residing in Harris County.

21. Plaintiff Lindsey McCrory, as Representative of the Estate of Blakely McCrory, Deceased, is an individual residing in Harris County. At the time of her death, Blakely McCrory resided in Harris County. No administration of her estate is pending, and none is necessary.



Copy from re:SearchTX

22. Plaintiffs Margaret Bellows, Lila Bonner, Molly DeWitt, and Lainey Landry were campers in Bubble Inn. They are pictured here with their counselors, plaintiffs Chloe Childress and Katherine Ferruzzo.




23. Plaintiff Blakely McCrory was a camper in the Twins cabins.



24. Defendant Camp Mystic, LLC is a Texas limited liability company. Because its registered agent for service of process, Richard Eastland, is deceased, it may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.



Copy from re:SearchTX

25. Defendant Natural Fountains Properties, Inc. is a Texas corporation with its principal place of business in Kerr County. Because its registered agent is deceased, service may be made on the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.

26. Defendant Mystic Camps Family Partnership, Ltd. is a Texas limited partnership with its principal place of business in Travis County. Because its registered agent is deceased, service may be made on the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.

27. Defendant Mystic Camps Management, LLC is a Texas limited liability with its principal place of business in Travis County. Because its registered agent is deceased, service may be made on the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.

28. George Albritton ("Britt") Eastland, as Representative of the Estate of Richard Eastland, Deceased, is in individual that resides in Kerr County. At the time of his death, Richard Eastland resided in Travis County. This defendant may be served with process at 401 West Main Street, Kerrville, Texas 78028, or wherever he may be found.

29. Defendant Willetta Eastland is an individual that resides in Travis County. She may be served with process at 2404 Scenic Drive, Austin, TX 78703, or wherever she may be found.

30. Defendant Edward Eastland is an individual that resides in Kerr County. He may be served with process at 2689 Hwy 39, Hunt TX 78024-3412, or wherever he may be found.

31. Defendant Mary Liz Eastland is an individual that resides in Kerr County. She may be served with process at 2689 Hwy 39, Hunt TX 78024-3412, or wherever she may be found.

32. Camp Mystic, LLC, Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC are alter egos of one another and referred to below together as the Camp. Unless otherwise indicated, the acts and omissions of the Camp were accomplished and directed by Richard and Willetta Eastland.



Copy from re:SearchTX

## JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction. Plaintiffs seek monetary relief in excess of $1 million. The damages sought are within the jurisdictional limits of this Court.

34. This Court has personal jurisdiction over defendants. All defendants are residents of this State or have their principal places of business in the State.

35. Venue is proper here under TEX. CIV. PRAC. & REM CODE §15.002. Defendants Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, and Willetta Eastland reside in Travis County. At the time of his death, Richard Eastland resided in Travis County.

## FACTS GIVING RISE TO THIS ACTION

### A. The Camp's History of Flooding

36. The Camp sits on 725 acres in the Texas Hill Country on the Guadalupe River. It was founded in 1926 and purchased by the grandparents of Richard Eastland in 1939. The camp, and its sprawling land, have been in the Eastland family ever since.

37. The part of the Guadalupe River on which the Camp sits has always been prone to deadly flash flooding. In fact, flash floods happen so frequently that the area has become known as "Flash Flood Alley." The Kerr County Judge recently described it as "the most dangerous river valley in the United States."

38. This risk of flash floods exists because of the combination of rocky, hilly terrain and shallow, non-absorbent soils. The landscape causes rain quickly to run off hills into the river, resulting in sudden rises in water levels. This is a known risk by those in the area when it rains.

39. Given its location, flooding has become a defining part of the Camp's history. The "Great Flood" of 1932 is memorialized in the Camp's materials given to campers. During that disaster, several cabins at the Camp were swept away, and campers were forced to evacuate across the river in canoes. Other nearby camps flooded as well, with one camp owner surviving by taking



Copy from re:SearchTX

refuge in a tree. Pilots surveying the scene the next day reported that some buildings were "flattened as though they had been stepped on by a giant foot." Survivors recounted that lives would almost certainly have been lost had the flood struck at night. This event is something that campers are asked about during the Camp's trivia nights nearly 100 years later.

40. The dangers did not end with the 1932 Great Flood. In 1978, only four years after Richard and Willetta Eastland began working at the Camp, another catastrophic flood struck. Remnants of a tropical storm stalled over the Hill Country, dropping 20 inches of rain overnight and causing the Guadalupe River to rise over 35 feet in nearby Comfort. Dozens of people lost their lives in the area, and children had to be evacuated from summer camps by the National Guard and other first responders. The Camp was reported to be "the most severely damaged" of all the youth camps. Hundreds of homes in the area were damaged or destroyed.

41. In 1985, floods created havoc at the Camp again. While Willetta Eastland was pregnant with their fourth child, flood waters cut off access to the nearby hospital. She had to be airlifted from the Camp to give birth. This event, occurring eleven years into the Eastland's tenure, demonstrates the persistent threat flooding posed whether the Camp was in session or not.

42. In 1987, flash flooding again turned deadly, when ten children were killed at another summer camp while trying to escape rising waters. In just three hours, up to 15 inches of rain fell near Hunt, causing the Guadalupe River to surge more than 30 feet. Hundreds of people along the river, including those at the Camp, were evacuated. Campers in Bubble Inn, one of the cabins at the center of the 2025 tragedy, were among those taken to higher ground.

43. The notions that Bubble Inn and Twins cabins at the Camp were not in harms' way, or that the July 4th flood was an unprecedented event, are fantasy. The Camp's history is riddled with floods, and this area has experienced a number of deadly flash floods in recent years.



Copy from re:SearchTX

**B. Defendants Knew About the Danger.**

44. Richard and Willetta Eastland worked at the Camp since 1974 and became co-directors in 1987. Their son Edward has served as director of the Camp since 2007. He and his wife Mary Liz live at the Camp year-round. Given their lengthy history at the Camp and the direct impact of many of these events, the Eastland family was well aware of the risks of flooding.

45. Richard served on the board of directors for the Upper Guadalupe River Authority in the 1980s and again from 2022 to 2025. The River Authority is a state agency that oversees the Guadalupe River in Kerr County.

46. As a director of the River Authority, Richard championed flood warning systems in the late 1980s and early 1990s. As a result of these efforts, the River Authority installed new warning systems after the deadly 1987 floods. But these systems became antiquated and unreliable by the late 1990s and were ultimately decommissioned.

47. Regardless of the technology that delivers it, Richard Eastland knew the importance of listening to warnings. When advocating for these systems, he cautioned, “The river is beautiful, but you have to respect it.” And he knew that failing to take flash flood warnings seriously could be deadly. In 1990, he prophetically told the *Austin-American Statesman*, “I’m sure there will be other drownings. People don’t heed the warnings.”

48. This understanding of the dangers is underscored by materials put out by the River Authority that were designed to educate the public. A River Authority video called “Be Flood Aware” explains that just 3-4 inches of rain in this area can cause serious problems, as the land causes water to rush rapidly during floods. Just a foot of water like this can sweep away most vehicles. For that reason, the River Authority on which Richard Eastland sat told Kerr County residents that the “best advice” it could “give is to never drive through flood waters.”



Copy from re:SearchTX

49. The River Authority also explained the importance of flash flood warnings issued by the National Weather Service. A warning "means the event is occurring or imminent, and you should take immediate steps to protect you and your family."

50. Given his time at Mystic and service on the River Authority, Richard Eastland knew what he was supposed to do when a flash flood warning was issued: "take immediate steps to protect" the campers and counselors under his care. And he knew that driving should not be one of those steps. Tragically, he and his son Edward failed to follow these critical rules when it mattered most.

**C. Defendants Focused on Profits Over Safety.**

51. Under Richard and Willetta Eastland's leadership, the Camp made decisions that made this tragedy inevitable. Each was part of a priority to focus on profits and protecting the family's land over other goals, even the safety of campers and counselors.

52. First, the Eastland family changed the structure of the Camp's ownership with the goal of protecting the family's land while still distributing large sums of money to themselves. In 1998, 11 years after Richard and Willetta become co-directors, they created a web of corporate entities that sought to separate the ownership of the land from the company running the Camp. In short, the Camp was placed in one company (Camp Mystic, LLC) and the land placed in another (Natural Fountains Properties, Inc.), and the Camp leased the land to operate. The lease payments distributed the Camp's profits to the land company, which were then distributed to its primary shareholders—the Eastland family. The idea was that the family could still get paid for the Camp's lucrative summers but protect the land if the Camp made bad decisions resulting in a lawsuit.

53. The flaw in their strategy was that the Eastlands insisted on maintaining control. Richard and Willetta made sure in the Camp's lease that important decisions like cabin location and the Camp's layout could not be changed without the approval of Natural Fountains Properties, Inc.



Copy from re:SearchTX

This gave the Eastlands and the entities they created full control over the property and its buildings, no matter who operated the Camp. They also made sure that all entities, including the Camp, landowner, and companies that own those entities (Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC), were controlled almost exclusively by Richard and Willetta Eastland at every level. Their desire for control over the land, the Camp, and its profits mean they cannot be legally separated.

54. Second, the Eastlands made catastrophic decisions concerning the cabin locations. Prior to 2013, most of the girls' cabins at the Guadalupe River site were in FEMA's 100-year "Special Flood Hazard Area," including Bubble Inn and Twins cabins (5 and 41 on the map):




55. FEMA considers structures in a Special Flood Hazard Area as "high risk." They are subject to flood insurance requirements and must adhere to certain floodplain management regulations. Some of the Camp cabins, including Twins and others that flooded on July 4, also are located in the regulatory floodway. FEMA defines this as "the channel of a river . . . and the adjacent lands that must be reserved in order to discharge the base flood."

56. In 2013, the Camp filed requests for cabins to be removed from FEMA's floodplain maps. FEMA approved most of these requests, including as to Bubble Inn and Twins. Some



Copy from re:SearchTX

structures, including the Bug House cabin that flooded on July 4, remained in the 100-year floodplain on FEMA's maps.

57. This did not change whether any of the cabins were prone to flooding or their relation to the river. The only effect was for the Eastlands to save money. While in the floodplain, owners must pay expensive insurance premiums, and renovations require certifications and other costly measures. Removing the cabins from FEMA's flood maps eliminated these expensive requirements for the Camp, but it did not make the cabins safer. Moreover, obtaining amendments to FEMA's flood maps is an expensive and burdensome process. The Camp chose to spend capital on that effort rather than move the cabins to safer locations.

58. Finally, the Camp implemented dangerous policies designed to save money at the expense of safety. Most significantly, despite knowing that some of its cabins were in flood zones and regulatory floodways, and despite experiencing major flood events at the camp firsthand, the Camp gave the counselors the following orders in the event of a flood:

> In case of flood, all campers on Senior Hill must stay in their cabins. . . . Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

59. In truth, the cabins are not "on high, safe locations." And defendants knew that they were not safe, both because of the FEMA classification that they fought in 2013 and also because of their experience managing the Camp for five decades and superior knowledge of the area. Parents, campers, and counselors did not know what defendants knew. Defendants gave these orders to counselors—and, since they were posted in cabins, to campers and parents as well—to conceal the dangers that defendants knew about but their invitees did not.

60. The Camp's "never evacuate" order was also profit-motivated in other respects. It ensured that counselors felt safe enough to work there for minimal compensation. And it ensured that parents kept sending their girls and money to the Camp. If campers and counselors knew the



Copy from re:SearchTX

cabins were located in dangerous flood zones, and evacuations were necessary but prohibited, parents would not send their children to sleep in those cabins. It also allowed the Camp to avoid implementing safety measures that would cost money, like lighted pathways, properly maintained routes to higher ground, and new structures on accessible higher ground.

61. The Camp's other policies exacerbated the risks created by the "never evacuate" order. The Camp invested no time or money in training counselors on how to evacuate should they be told to do so. Instead, counselors flipped through their manuals with Edward and Mary Liz Eastland and were told a flood was not going to happen. The Camp also prohibited cell phones, even for counselors, who were given no walkie talkies or other means of communicating in the event of an emergency. Walkie talkies and working intercoms with backup power were costs that the Camp chose not to bear, despite the obvious need. The Camp chose not to spend money on these and other basic safety measures.

62. These decisions allowed defendants to make large sums of money. In recent years, the Camp brought in millions in revenue every summer. Its costs are low, with a staff of mostly migrant workers and 18-year-old girls getting minimal pay, and many of its buildings are 50-100 years old. The river of profits were distributed annually to the Eastlands. And it allowed them to have houses on the property and other lakefront homes elsewhere. Their decision to put profits over safety has created true generational wealth from a very dangerous Camp. And these years of poor decision making culminated in the tragedy that ensued on July 4, 2025.

**D. On July 3 and July 4, Critical Warnings Were Issued.**

63. Starting on July 3, the Camp began getting alerts from the National Weather Service about the potential for significant rain and floods. As early as 1:18 p.m., the Weather Service issued a Flood Watch that was in effect through the following morning. These types of alerts have real



Copy from re:SearchTX

meaning to people like the Eastlands, who have seen what floods in the area can do in their roughly 50 years at the Camp.

64. By the early hours of July 4, the Camp was aware of the increasing danger. At midnight, nightwatchman Glenn Juenke was monitoring rain gauges. And when several counselors returned from their night off around 1 a.m., they told senior camp staff that the rain was so bad they were scared to drive back to camp. Yet as those counselors went back to their cabins, defendants took their phones and did not give them any emergency communication devices.

65. At 1:14 a.m., the Weather Service issued a warning of "life threatening flash flooding." The expected "flash flood damage threat" was "considerable." It warned, "Turn around, don't drown. . . . Most flood deaths occur in vehicles."

66. The Camp got this warning. Its spokesman told reporters that Richard Eastland got the warning. It later said there is "some question" about who got it but admitted Camp leadership was aware of the warning and monitoring the situation "within minutes" of the warning going out.

67. The 1:14 a.m. flash flood warning was the time to begin saving lives. The River Authority on which Richard Eastland served says a warning like this means "the event is occurring or imminent, and you should take immediate steps to protect you and your family." And, as he admitted, people drown when they don't heed warnings. But tragically, the Camp took no steps to protect the lives of its campers or counselors for more than an hour after receiving the 1:14 a.m. flash flood warning. Instead, Richard and Edward Eastland spent the next hour and fifteen minutes working to keep Camp equipment dry while they watched the river swell with flood waters.

**E. The Camp Ignored the Warnings and Protected Equipment, Not Girls.**

68. Richard and Edward met in the main office around 1:45 a.m., some 30 minutes after the warning. Rather than turning to the cabins, they convened the grounds crew and started securing



Copy from re:SearchTX

equipment. The Camp reports it has a picture of Richard Eastland with the grounds crew at 2:13 a.m. still working on this task. By that point, 59 critical minutes had passed since defendants were warned by the weather service of "life threatening flash flooding" impacting their camp.

69. Warnings continued to pour in and be ignored. By 2:00 a.m., Edward Eastland realized the water was high enough at a creek crossing that he would not be able to get back to his home on the other side of the property. When he and Richard tried to send home nightwatchman Juenke, one of the few other adults on the property, they realized he could not leave because of the rising waters. And by 2:14 a.m., Juenke took a video of what is normally a calm creek on the property that had turned into a rushing river. Still, Richard and Edward did not check on their campers or counselors. They just continued to watch the flood waters move toward the cabins.

### F. As Counselors Begged for Help, the Camp Told Them to "Stay Put."

70. The first contact between counselors and Richard and Edward came at roughly 2:20 a.m., when counselors decided, on their own, to run across the camp to ask for help. Counselors from Bug House and Look Inn ran through the rain to report that water was coming into Bug House, the cabin closest to the river.

71. Richard and Edward went to the cabin to investigate. They told the girls to put down towels, and they returned to the office. Per nightwatchman Juenke, the Camp's response was for the girls to "stay put 'because that's the plan.'" Even when they knew creeks were becoming rivers and water was coming into cabins, defendants stuck with the official plan for girls to never evacuate.

72. A last warning came after Richard and Edward returned from Bug House to the office. Around that time, Edward received a call from the front gatekeeper that water was rushing into her building. The gatekeeper told Edward she could not open the door to escape, and the call



Copy from re:SearchTX

cut out. The gatekeeper was washed away. She survived by hanging onto a tree for the rest of the night. Only at this point did Richard and Edward agree they should begin evacuating campers.

**G. With the Danger Obvious, Only Some Cabins Were Evacuated.**

73. Starting at roughly 2:30 a.m., campers and counselors from five cabins began evacuating to the Rec Hall located by the office. This was an older, two-story structure on higher ground than the lower lying cabins. This map of the flats area, which was posted outside the cabins, shows Rec Hall on the left in green, and the cabins on the bottom and the right in blue.




74. Richard, Edward, and Glenn took girls to Rec Hall in their cars, while many others walked or ran across the lawn to Rec Hall. From Bug House, the furthest cabin, Rec Hall is less than 1000 feet away. A car drive from Bug House to Rec Hall takes 40 seconds. The walk takes just over 3 minutes for an adult at a normal pace.

75. Between 2:30 and 3:30 a.m., and despite the short distance, Richard and Edward only managed to evacuate five cabins to Rec Hall – Bug House, Look Inn, Hang Out, Tumble Inn,



Copy from re:SearchTX

and Jumble House. Defendants never evacuated the remaining six cabins – Nut Hut, Chatter Box, Wiggle Inn, Giggle Box, Twins, and Bubble Inn – to Rec Hall or anywhere.

**H. Chaos Ensued, As Other Counselors and Campers Ran for their Lives.**

76. While the first five cabins were evacuated, counselors in the remaining cabins were told by camp staff *not* to evacuate. Thus, even as defendants watched flood waters rise and knew evacuations were vital, the Camp continued to order campers and counselors to stay in the cabins.

77. Many counselors in the remaining cabins watched the evacuations of their fellow counselors and campers. The route to Rec Hall from the first five cabins runs directly past the other cabins, including Twins and Bubble Inn. Counselors from Nut Hut, directly across the road from Bubble Inn, talked to the girls being evacuated as they went. Those Nut Hut counselors were told to stay in their cabins by the Camp. Counselors from Giggle Box and Twins were similarly told by the Camp to stay in their cabins during or after the evacuations of the first five cabins.

78. As flood waters continued to rise, counselors from the remaining cabins looked for help from the Camp, but none arrived. Counselors from Nut Hut tried to walk to get help, but they could not get there. Rather than wait it out, as they were told, they returned to their cabin and decided to evacuate on their own. When they could not open the door because of rising waters, they broke windows to escape and ran up a nearby hill. Counselors in two other cabins near the hill also decided to evacuate, pulling young girls through their windows and climbing to safety on their own. They ran through pouring rain and lightning to the top of a hill where they waited for hours. While doing so, they could hear screams for help from other cabins that housed their friends and fellow campers.

79. These hours for the girls taken to Rec Hall were just as harrowing and chaotic. None of the defendants came to assist them or give instructions until much later in the morning, even though they knew the flood water was rising and that evacuation was necessary. Mary Liz Eastland



Copy from re:SearchTX

and Willetta Eastland were nowhere to be found despite knowing the flooding was occurring, as they found their own safe, high ground. As flood waters rose inside, counselors took their campers to the second floor. From there they could see staff known as the "Big 3" stranded on a roof across the pavilion and others struggling for their lives to climb up. They could also see counselors from nearby cabins, including Twins, flashing SOS on their flashlights, begging the Camp for help.

**I. Defendants Made Fatal Decisions for the Bubble Inn and Twins Cabins.**

80. According to the Camp, Richard and Edward's final trip to the cabins occurred before 3:35 a.m., more than two hours after the Camp got the life-threatening flash flood warning.

81. Richard drove to Bubble Inn in a Tahoe, and Edward went to Twins on foot. This picture, taken at 3:26 a.m., shows girls safely walking to Rec Hall just minutes before.



The Camp has no explanation for why it failed to tell the Bubble Inn and Twins girls to walk to Rec Hall at that same time. It would have saved the lives of 27 young girls.

82. According to the Camp, Richard Eastland was swept away from Bubble Inn in his car and submerged by 3:51 a.m. He was found the next day not far from the Camp with campers inside the car. The car appears to have smashed against a tree. All inside were killed. A counselor that witnessed Richard's car being lifted and swept away reported seeing many campers in the car.



Copy from re:SearchTX

She believes he had loaded all cabin occupants in his Tahoe. All 13 campers and 2 counselors from Bubble Inn were killed, with some being swept miles downstream.

83. According to Edward, Richard parked at Bubble Inn with water at the top of his wheels. The Camp described this as waist-deep water that became neck-deep. Richard Eastland tried to load the girls in his car in these conditions. He and the Camp knew better than anyone the dangers of driving through even a foot of flood waters, much less neck-deep water. Defendants' conduct on July 4 and the years before was grossly negligent, and they knew it was substantially certain to result in the death of campers and counselors in Bubble Inn, including Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Chloe Childress, and Katherine Ferruzzo.

84. When Richard went to Bubble Inn, Edward went to the Twins cabins. Girls there had been woken by thunder earlier, but they were told to stay put. They watched as other campers walked past them to Rec Hall. When Edward finally arrived close to 3:35 a.m., the girls pleaded with him to evacuate, but he told them they had to stay because the water would go back down.

85. The flood waters did not recede. The girls got on their top bunks, as the water pressed them against the cabin ceiling. Several girls decided to swim out to avoid drowning in the cabin, and others were swept out by rushing waters. Some girls never made it out of the cabin.

86. Edward was swept through the door of Twins II and submerged at 4:09 a.m. He and several girls were swept to a tree near Bug House, where they held on until morning. Some campers tried to hold onto the tree and were pulled away, while others floated by and were unable to grab it. Girls in the tree watched in horror as their friends floated by begging for help. Eleven campers from Twins I and II were killed, including Blakely McCrory.



Copy from re:SearchTX

87. This tragedy was entirely preventable. Bubble Inn and Twins are only 300 feet from Rec Hall and 70 feet from a nearby hill, as these pictures taken from outside the cabins show:

**View of Rec Hall from Bubble Inn Cabin**



**View of Rec Hall from Twins Cabins**





Copy from re:SearchTX

88. This aerial photo captured after the floods shows the short path from Twins and Bubble Inn to Rec Hall:




89. It takes 60 seconds for an adult to walk from the cabins to Rec Hall and 40 seconds to walk to the hill. If defendants had not ordered the girls to stay in their cabins, they had *hours* to safely walk to either of these safer locations at any time from 1:14 a.m. to at least 3:26 a.m., when pictures show it was still safe to walk. Instead, defendants spent an hour moving camp equipment, did nothing more until counselors demanded action, and then evacuated only five of the cabins. Some of the remaining girls were able to run for their lives up the nearby hill. Defendants ordered the girls in Bubble Inn and Twins to stay put. Finally, Richard loaded the Bubble Inn girls into his car, and Edward joined the girls in Twins, with neither man having any way to keep the girls safe.

90. Defendants knew that if they ordered counselors and campers to stay in their cabins, even watching the rising flood waters and knowing the area's history of catastrophic flooding, it was substantially certain the girls would sustain grave or fatal injuries. Despite that, they ordered the campers and counselors in Twins and Bubble Inn to stay in their cabins when they easily could have



Copy from re:SearchTX

walked to safety in a matter of minutes. These decisions caused the preventable deaths of 27 campers and counselors despite having ample time to get them to higher, safe ground.

**J. The Camp's Post-Flood Actions Inflicted Further Pain.**

91. Defendants' behavior and decisions, starting later in the morning of July 4, has only made this unimaginable tragedy worse.

92. When the water receded, it was clear that several girls had died. Some campers were found in Richard Eastland's car and at least one inside a cabin. Yet when defendants reached out to families at 11:30 a.m., they told all of them their daughters were "unaccounted for." Mary Liz Eastland texted parents throughout the day, saying nothing about the known deaths until some of the families learned the truth from authorities late in the evening. For several families, this provided false hope their daughters could be alive – when defendants knew they were dead. In the coming days, as more bodies were found, defendants did not tell the girls' families, again providing them with false hope and prolonging the suffering of waiting to know the truth.

93. Defendants' communications since the flood have made this tragic situation even worse. For example, defendants have sent letters invoking an image of Richard Eastland singing in a heavenly choir with their deceased daughters, and reached out to older siblings of those that died with veiled references to forgiveness. They have even used the names of counselors killed in Bubble Inn while trying to recruit next summer's counselors.

94. Most recently, defendants enthusiastically announced the Camp would reopen next summer. Yet a camper, Cile Steward, remains missing. Again, defendants used the deceased girls as a recruiting tool, touting a "memorial" they would build in their honor – without ever asking the parents of the girls. Defendants' rush to reopen their for-profit campsite, while parents still grieve



Copy from re:SearchTX

their lost daughters, is only the latest example of the Camp putting profits over all else. The Camp is ready to move on, but these girls and their parents first deserve transparency and justice.

## CAUSES OF ACTION

### COUNT 1 – NEGLIGENCE

95. All prior material fact allegations are incorporated.

96. Defendants owed a duty of reasonable care to protect campers and counselors at the Camp.

97. Through their acts and omissions, Defendants breached that duty.

98. Defendants' breach proximately caused injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

99. Defendants were substantially certain that their acts and omissions in breaching their duty of care would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo. Defendants' acts and omissions did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents.

### COUNT 2 – NEGLIGENCE PER SE

100. All prior material fact allegations are incorporated.

101. Under Tex. Admin. Code §265.15(k), defendants were required to have "A written plan of procedures to be implemented in case of a disaster," which had to include plans for "evacuation of each occupied building and the facility." Defendants were required to post the Camp's evacuation plan in its "administrative on-site office and in each permanent and semi-permanent occupied building" and to train the Camp's employees concerning this plan.



Copy from re:SearchTX

102. Defendants did none of these things. Instead, they implemented a plan that *prohibited* evacuation and required counselors to follow that plan no matter the circumstances:

> Floods
> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

103. Defendants provided no training as to how and when evacuation should occur, much less training specific to the evacuation plan that the Camp was required to have.

104. Tex. Admin. Code §265.15(k) is designed to protect campers and counselors from serious injury or death in the event of a disaster such as flooding. Plaintiffs belong to the class of persons that the statute was designed to protect, and their injuries are the type of injuries that the statute was designed to prevent.

105. Tex. Admin. Code §265.15(k) is a statute for which tort liability may be imposed. Imposing tort liability is consistent with its legislative intent; the statute defines a mandatory standard of conduct; and imposing tort liability for its violation is fair, workable, and wise.

106. Defendants' acts and omissions violated Tex. Admin. Code §265.15(k), without excuse, and proximately caused injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

107. Defendants were substantially certain that their violation of Tex. Admin. Code §265.15(k) would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo. Defendants' violation did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents.



Copy from re:SearchTX

## COUNT 3 – NEGLIGENT UNDERTAKING

108. All prior material fact allegations are incorporated.

109. While defendants did not have an evacuation plan, they negligently undertook an unplanned and poorly executed ad hoc evacuation on July 4.

110. When defendants tried to evacuate the cabins, they undertook to perform services that they knew, or should have known, were necessary for the protection of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo.

111. Through their acts and omissions, defendants failed to exercise reasonable care in performing those services.

112. Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo relied on defendants' undertaking, believing that defendants knew what they were doing when they did not and were woefully unprepared for the situation. Defendants' undertaking increased the risk of harm to Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and the other campers.

113. Defendants' negligent undertaking proximately caused the injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

114. Defendants were substantially certain that the acts and omissions in their negligent undertaking would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and



Copy from re:SearchTX

Katherine Ferruzzo. Defendants acts and omissions did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents.

## COUNT 4 – PREMISES LIABILITY

115. All prior material fact allegations are incorporated.

116. Defendants owned and controlled the Camp premises before and as of the time of this tragedy and owed a duty of reasonable care to Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo, who were invitees.

117. The Bubble Inn and Twins cabins were unreasonably dangerous. They were in an area prone to flooding, and none was equipped to keep occupants safe in the event of a flood.

118. Defendants knew or reasonably should have known of this danger based on their knowledge of extreme flooding risks in the area, considering the locations of the cabins and past flood events that had hit the Camp.

119. Defendants breached their duty of care by failing to adequately warn of the dangerous condition and make the condition reasonably safe. In so doing, defendants concealed the unreasonably dangerous condition of the Bubble Inn and Twins cabins from campers and counselors. And because defendants refused to move the cabins to locations that were safe, they failed to make the condition reasonably safe for campers and counselors.

120. Defendants' breach of duty proximately caused the injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

121. Defendants were substantially certain that the breach of their duty would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo. Defendants



Copy from re:SearchTX

acts and omissions did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents

## COUNT 5 – GROSS NEGLIGENCE

122. All prior material fact allegations are incorporated.

123. Defendants' acts and omissions, viewed objectively from their standpoints when their conduct occurred, involved and posed an extreme degree of risk to Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo, considering the probability and magnitude of the potential harm to them and others. Defendants had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo as well as other campers and counselors. Defendants' acts and omissions proximately caused their injuries and death.

124. Defendants' acts and omissions constitute gross negligence under Tex. Civ. Prac. & Rem. Code §41.003(a)(3).

125. This misconduct entitles plaintiffs to recover exemplary damages from defendants. Plaintiffs seek such damages from each defendant in the full amount allowable by law.

## COUNT 6 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

126. All prior material fact allegations are incorporated.

127. Plaintiffs Warren and Patricia Bellows, Blake and Caitlin Bonner, Matthew and Wendie Childress, Ryan and Elizabeth DeWitt, John and Andrea Ferruzzo, Ben and Natalie Landry, and Lindsey McCrory are individual parents of their deceased daughters.



Copy from re:SearchTX

128. Defendants' conduct after the deaths of their daughters Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo was extreme and outrageous.

129. Defendants acted intentionally or recklessly, and their conduct proximately caused Warren and Patricia Bellows, Blake and Caitlin Bonner, Matthew and Wendie Childress, Ryan and Elizabeth DeWitt, John and Andrea Ferruzzo, Ben and Natalie Landry, and Lindsey McCrory to suffer severe emotional distress, for which they seek damages.

130. No alternate cause of action would provide a remedy for the severe emotional distress caused by defendants' conduct.

**WRONGFUL DEATH AND SURVIVAL ACTIONS**

131. Plaintiffs bring these actions pursuant to the Texas Wrongful Death Act, Texas Civil Practice & Remedies Code § 71.001 *et seq*, and the Texas Survival Statute, Texas Civil Practice and Remedies Code § 71.021.

**EXEMPLARY DAMAGES**

132. Plaintiffs seek exemplary damages against defendants for their gross negligence and intentional infliction of emotional distress.

**ALTER EGO – SINGLE BUSINESS ENTERPRISE –VEIL PIERCING**

133. Camp Mystic, LLC owns and operates the Camp. The only two officers identified in public filings are Richard Eastland and Willetta Eastland. Natural Fountains Properties, Inc. owns the land on which the Camp is located. Richard Eastland is its Chief Executive Officer, and Willetta Eastland is its Secretary. Mystic Camps Family Partnership, Ltd. is a family limited partnership that is the 100% owner of Natural Fountains Properties, Inc. and Camp Mystic, LLC. Mystic Camps Management, LLC is the general partner of Mystic Camps Family Partnership, Ltd. Its two members identified in public filings are Richard and Willetta Eastland.



Copy from re:SearchTX

134. These various entities should be disregarded and their corporate forms deemed not separate. Allowing them to maintain the legal fiction of separate entities would promote injustice and evade duties and accountability. These entities also were and are operated as a single business enterprise.

135. Alternatively, Mystic Camps Family Partnership Ltd. has used its subsidiaries, including Camp Mystic, LLC and Natural Fountains Properties, Inc., to perpetrate an actual fraud primarily for the benefit of their parent entities.

## RESPONDEAT SUPERIOR

136. The individual Camp employees acted in the course and scope of their employment. The Camp is liable for their acts and omissions under the doctrine of respondeat superior.

## JURY DEMAND

137. Under Tex. R. Civ. P. 216, plaintiffs demand a trial by jury on all issues so triable. Plaintiffs have paid the required jury fee.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that defendants be cited to appear and answer, and after trial or final hearing, the Court enter judgment for plaintiffs for their full actual damages, including conscious pain and suffering before death, conscious mental anguish suffered before death, funeral expenses, past and future mental anguish, past and future counseling expenses, past and future loss of companionship and society, loss of services, and past and future lost earning capacity. Plaintiffs also seek exemplary damages, prejudgment and post-judgment interest, all costs of suit, and all other relief to which they are entitled at law or in equity.



Copy from re:SearchTX

Dated: November 10, 2025

Respectfully submitted,

*<u>/s/ R. Paul Yetter</u>*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFFS



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lisa Prince on behalf of R. Yetter
Bar No. 22154200
lprince@yettercoleman.com
Envelope ID: 107861588
Filing Code Description: Petition
Filing Description: ORIGINAL PETITION
Status as of 11/10/2025 3:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Lisa Prince | | lprince@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |

Copy from re:SearchTX