5/4/2026 5:01 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Stephanie Garza

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**PLAINTIFFS' SECOND AMENDED PETITION**

COME NOW, Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; and, Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen


Copy from re:SearchTX

Toranzo (collectively "Plaintiffs"), complaining of Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, and William Neely Bonner III (collectively, "Defendants"), and would respectfully show the Court the following:

## I.

## DISCOVERY LEVEL

1. Discovery may be conducted under Level 2 of the Texas Rules of Civil Procedure.

## II.

## NATURE OF THE CASE

2. Plaintiffs bring this wrongful death and survival action against Defendants for their negligence and gross negligence which resulted in the deaths of Ellen Elizabeth Getten, Linnie Anne McCown, Abby Lynn Pohl, Margaret Gaffney Sheedy, Mary Barrett Stevens, and Greta Katherine Toranzo on or about July 4, 2025.



Copy from re:SearchTX

## III.

## PARTIES



3. Ellen Elizabeth Getten ("Ellen"), deceased, was a nine-year-old child residing in Texas at the time of her death. She is represented by her biological father, Douglas Getten, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Ellen Elizabeth Getten.

4. Plaintiff Jennifer Getten is a resident of Texas and the biological mother of Ellen Elizabeth Getten, deceased.



Copy from re:SearchTX



5. Linnie Anne McCown ("Linnie"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Michael McCown, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Linnie Anne McCown.

6. Plaintiff Callie McCown is a resident of Texas and the biological mother of Linnie Anne McCown, deceased.



Copy from re:SearchTX



7. Abby Lynn Pohl ("Abby"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Matthew Pohl, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Abby Lynn Pohl.

8. Plaintiff Kristin Pohl is a resident of Texas and the biological mother of Abby Lynn Pohl, deceased.





Copy from re:SearchTX

9. Margaret Gaffney Sheedy ("Margaret"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Andrew Sheedy, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Margaret Gaffney Sheedy.

10. Plaintiff Ellen Sheedy is a resident of Texas and the biological mother of Margaret Gaffney Sheedy, deceased.



11. Mary Barrett Stevens ("Mary"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Johnny Stevens, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Mary Barrett Stevens.

12. Plaintiff Stacy Stevens is a resident of Texas and the biological mother of Mary Barrett Stevens, deceased.



Copy from re:SearchTX



13. Greta Katherine Toranzo ("Greta"), deceased, was a ten-year-old child residing in Texas at the time of her death. She is represented by her biological father, Jorge Toranzo, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Greta Katherine Toranzo.

14. Plaintiff Ellen Toranzo is a resident of Texas and the biological mother of Greta Katherine Toranzo, deceased.

15. Defendant Natural Fountains Properties, Inc. DBA Camp Mystic, Inc. ("NFP") is a domestic corporation headquartered in Texas. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

16. Defendant Mystic Camps Family Partnership, LTD. ("Mystic Camps FP") is a domestic limited company headquartered in Texas with its registered office located in Travis County at 2404 Scenic Drive, Austin, Texas 78703. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.



Copy from re:SearchTX

This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

17. Defendant Mystic Camps Management, LLC ("Mystic Camps Management") is a domestic limited liability company headquartered in Texas with its registered office located in Travis County at 2404 Scenic Drive, Austin, Texas 78703. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

18. Defendant Camp Mystic, LLC is a domestic limited liability company headquartered in Texas. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

19. Defendants Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, and Camp Mystic, LLC are collectively referred to herein as "Camp Mystic."

20. Willetta ("Tweety") Eastland is an individual residing in Travis County, Texas. This Defendant may be served with process at 2404 Scenic Dr., Austin, TX 78703 or wherever she may be found.

21. Edward Eastland is an individual residing in Texas. This Defendant may be served with process at 1105 Lois St., Kerrville, TX 78028, or wherever he may be found.

22. Mary Liz Eastland is an individual residing in Texas. This Defendant may be served with process at 1105 Lois St., Kerrville, TX 78028, or wherever she may be found.



Copy from re:SearchTX

23. William Neely Bonner III ("Neel Bonner") is an individual residing in Texas. This Defendant may be served with process at 4147 Lanark Ln., Houston, TX 77057, or wherever he may be found.

24. In the event any parties are misnamed or not included herein, Plaintiffs contend this was the result of a misidentification, misnomer, and/or such parties are or were alter egos of parties named herein. Alternatively, Plaintiffs contend any such "corporate veils" should be pierced to hold such parties properly accountable in the interest of justice.

25. Pursuant to Rule 28 of the Texas Rules of Civil Procedure, Plaintiffs are suing any partnership, unincorporated association, private corporation, or individual whose name contains the words, or who does business under the name of the Defendants.

## IV.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction as the claims asserted arise under Texas law. Additionally, Plaintiffs have been damaged in a sum far in excess of the minimum jurisdictional limits of this Court.

27. Pursuant to the forum defendant rule, this case is not removable because all Defendants are citizens of Texas with residence and/or their principal places of business in Texas. 28 U.S.C. § 1441(b), § 1332(c).

28. This Court may exercise personal jurisdiction over Defendants because they are either citizens of the State of Texas or conduct a substantial amount of business in Texas.

29. Venue is proper in Travis County, Texas because one or more Defendants reside in this county. TEX. CIV. PRAC. & REM. CODE § 15.002. Specifically, Defendant Willetta Eastland is a natural person and resides in Travis County. According to property records, the



Copy from re:SearchTX

property listed as her homestead exemption is located in Travis County. Furthermore, Defendants Mystic Camps Family Partnership Ltd. and Mystic Camps Management, LLC are not natural persons and have their principal offices in Travis County.

30. Furthermore, when proper venue is established for one defendant, venue is proper for all defendants in the same action. TEX. CIV. PRAC. & REM. CODE § 15.005.

## V.

## FACTS

31. On July 4, 2025, Ellen Elizabeth Getten was a nine-year-old child at Camp Mystic – a summer camp for girls located in Hunt, Texas. It was her first year at Camp Mystic, and she was excited to make new friends and have new experiences.

32. Linnie Anne McCown was eight years old when she attended Camp Mystic and tragically lost her life. She was anticipating returning home from Camp and starting third grade at her elementary school. Her parents had no idea she would never be able to add her vibrant energy to her school community ever again.

33. Abby Lynn Pohl was eight years old when she went to Camp Mystic with her two older sisters. Her parents expected two pick up three beautiful, happy girls at the end of the summer camp session, but instead, were only able to bring home two daughters.

34. Margaret Gaffney Sheedy was also eight years old when her life was cut tragically short at Camp Mystic. One of her greatest joys was being a friend, and she was ready to bring her kindness and creativity to all of the girls she met at Camp that summer.

35. Mary Barrett Stevens, affectionately known as "May May" by those closest to her, was also only eight years old when she attended Camp Mystic. She lived life to the fullest,



Copy from re:SearchTX

and she was ready to try new things during her first year at Camp with the utmost excitement and energy.

36. Greta Katherine Toranzo was ten years old when she was taken from this Earth while at Camp Mystic. It was her third summer at Camp, and she was excited to be reunited with friends and counselors, enjoying games and nature for a few weeks before school.

37. Like all young, defenseless, little girls, these children expected to be protected while at camp. They expected to be kept safe. They, and their parents, expected they would be returned home after the summer session in the same physical condition as when they left. The last thing that any parent expects is to send their child to camp, only to have to arrange a funeral rather than bring home their little girl. Yet, that is what happened to these girls' parents. This case is being brought to seek justice, to demand accountability, and raise awareness regarding Camp Mystic and the Defendants' actions and failures in the hopes that no parent has to ever suffer as these parents have, and that no child like Ellen, Linnie, Abby, Margaret, Mary or Greta, has to ever die a horrific, traumatic, and preventable death at a camp again.

***A. History of Camp Mystic***

38. Established in 1926, Camp Mystic (the "Camp") is a private summer camp for girls located along the Guadalupe River in Hunt, Texas. Richard "Dick" Eastland and his wife, Defendant Willetta "Tweety" Eastland, were the Owners and Executive Directors of Camp Mystic since 1974. Dick and Tweety Eastland were the third generation to manage the Camp since the Eastland family acquired it in 1939. The Eastland Family is now in its fourth generation of operation with Defendants Edward and Mary Liz Eastland acting as the Directors at Camp Mystic Guadalupe River. At all material times, Defendant Natural Fountains



Copy from re:SearchTX

Properties, Inc. ("NFP") owned the real property where Camp Mystic operated. Defendant Bonner is the President of Defendant NFP.

39. Since its inception, Camp Mystic has experienced numerous floods, and several of its cabins are in or near the 100-year floodplain. In fact, many of the cabins at the Camp were placed in designated flood zones, including in areas deemed by Kerr County to be extremely hazardous. This dangerous and potentially fatal flood risk had been known to Camp Mystic for nearly a century. The Guadalupe River Basin is undeniably one of the most dangerous areas in the entire country for flash floods. Camp Mystic itself has been impacted by these flash floods on numerous prior occasions, placing Defendants on repeated notice of the serious and foreseeable risk of catastrophic flooding.

40. As far back as July 1932, Camp Mystic suffered from severe flash floods. That month, a massive flood inundated Camp Mystic, washing away cabins and sweeping away property and personal belongings. The girls at the Camp at the time were directed to evacuate to higher ground moments before the deadly flood waters washed through the Camp's structures, leaving a wake of destruction in their path. By sheer luck, none of the girls died during this flood, although archived news reports described the girls having to rush to safety and being left stranded without food while a plane flew over the site dropping notes stating that help was on the way. Four people reportedly died during the flood along the river, and local authorities and camp management acknowledged that the outcome at Camp Mystic could have been much worse had the flooding occurred at night.

41. The Camp was again impacted by flooding from the Guadalupe River in 1978 when over 100 campers had to be relocated to higher ground with other staff in the middle of the night. The Camp was faced with destruction from deadly floodwater, forcing the



Copy from re:SearchTX

suspension of camp activities for several days and leaving the girls without food for a couple of days. According to Kerr County, the floodwaters almost reached the top of the dining hall stairs at the Camp. While the campers were spared from death, the flooding killed thirty-three people in Kerr County, emphasizing the very real threat of injury and death to the young girls at Camp Mystic.

42. Then again in 1984, the Camp faced flash flooding hazards and the need for evacuation. Raging waters cut off roadway access to and from the Camp, stranding campers and staffers alike in a deadly situation. In fact, Defendant Tweety Eastland was on the property and due to a medical condition, she was forced to evacuate via helicopter to escape the harrowing flood. In a mere six years' time, Camp Mystic – being operated and managed by Dick and Tweety Eastland – not only knew of the extremely hazardous flooding risks, but the Defendants actually experienced deadly floods and last-minute emergency evacuation attempts. Despite this, the Defendants did nothing to relocate facilities or cabins or inform the public and families of the real danger.

43. Because of this failure, unsuspecting parents have sent their precious daughters to Camp Mystic to spend the summer fishing, canoeing, and enjoying time with friends on the Guadalupe River for decades without any appropriate warnings about the actual dangers. Rather than informing parents of the extremely hazardous location of the activities and cabins where their daughters would be living and sleeping, the Defendants chose to remain silent and collect tuition checks for the privately owned camp for decades. The Defendants decided that expanding its for-profit camp was also more important than relocating the most at-risk cabins away from the river or attempting to better protect the vulnerable human lives that visited the Camp every summer.



Copy from re:SearchTX

44. In fact, when the Camp pursued a $5 million construction project six years ago, the Defendants chose to construct new cabins in a designated flood-risk area. The Defendants also chose to keep other cabins in the flood zone of a river basin, rather than relocate the older buildings that were in the most danger. Instead, the Defendants intentionally put young girls in a dangerous area with a long history of fatal floods. Several of the cabins that were hit hardest in the July 2025 flood were in an area identified by the Federal Emergency Management Agency (FEMA) as the highest-risk location for flooding. Some of the cabins were so close to the Guadalupe River that they were considered part of the river's floodway.




*Map from The New York Times*

45. Not only did the Defendants know that cabins and facilities were in a designated flood zone, but the Defendants also took steps to hide this risk from the public, including the campers and their parents, by leveraging appeals to FEMA to have the "100-year floodplain"



Copy from re:SearchTX

designation removed from dozens of buildings. FEMA had included Camp Mystic in a "Special Flood Hazard Area" in its National Flood Insurance map for Kerr County in 2011. This meant that Camp Mystic was required to have flood insurance and faced tighter regulations on any future construction projects on the grounds. So, not only would the removal of this designation allow the Defendants to promulgate the falsity that the facilities were "safe" from a known flood risk, but the de-designation would also allow Camp Mystic to either avoid flood insurance requirements, lower its insurance premiums, or not be faced with more stringent regulations on future construction. Said another way, the Defendants decided to put money and profits over the lives of children and transparency to parents and the public.

46. Although the Camp's pleas to FEMA resulted in several structures being removed from the designation over the past several years, many buildings remained in the flood designation area. At least twelve structures at Camp Mystic were fully within FEMA's 100-year flood plain, and more were partially in that zone. Despite this, the Defendants still did not inform the Plaintiffs of the known, deadly, flood risk. And despite this, the Defendants continued operating the Camp filled with hundreds of young girls every summer in the floodplain without implementing adequate emergency procedures, creating necessary evacuation infrastructure, or putting measures in place to protect the innocent lives in their care.

***B. July 2025 Flood***

47. On July 2, 2025, the Texas Division of Emergency Management ("TDEM") announced that it was activating state emergency response resources in anticipation of increased threats of flooding heading into the holiday weekend. This announcement was made two days prior to the catastrophic flooding that killed twenty-seven girls at Camp Mystic and



Copy from re:SearchTX

was based on the National Weather Service ("NWS") prediction that heavy rainfall with the potential to cause flash flooding was anticipated to begin on July 2, 2025, and continue for a few days.

For Immediate Distribution | July 2, 2025 | media@tdem.texas.gov

**TDEM Activates State Emergency Response Resources Ahead Of West, Central Texas Flood Threat**

The Texas Division of Emergency Management (TDEM) today announced that the agency activated state emergency response resources in anticipation of increased threats of flooding in parts of West and Central Texas heading into the holiday weekend.

"As rain and flooding threatens parts of Texas ahead of the Independence Day weekend, state emergency response resources have been activated to support local response efforts," said Texas Emergency Management Chief Nim Kidd. "Our priority remains protecting lives and property and Texans are urged to proactively prepare for potential hazards. Remember: Turn Around, Don't Drown."

According to the National Weather Service, heavy rainfall with the potential to cause flash flooding is anticipated across West Texas and the Hill Country beginning tonight and is expected to last a few days. Texans are encouraged to monitor local forecasts and avoid driving or walking into flooded areas.

*Excerpt from https://tdem.texas.gov/press-release/7-2-25*

48. Camp Mystic and its owners and directors would have been privy to this TDEM emergency response activation and should have been monitoring the weather as early as two days before the tragedy. Furthermore, the state emergency response provided additional resources to Camp Mystic to support flood response operations including but not limited to rescue boat squads and helicopters well in advance of the July 4, 2025, flood.

49. Then, at 1:18 p.m. on Thursday, July 3, 2025, the National Weather Service issued a flood watch for the south-central Texas area, including Kerr County where Camp Mystic is located. This flood watch clearly indicated there was a specific flood threat for the Camp Mystic grounds, and the conditions were ripe for a flood to occur. This notification should have put Camp Mystic and the Defendants on high alert, especially given the Defendants' familiarity with "Flash Flood Alley," and their actual knowledge surrounding how



Copy from re:SearchTX

quickly the river can rise at Camp Mystic from prior flooding events. Simply put, Camp Mystic and the Defendants had ample time to evacuate all campers and staffers and prevent otherwise inevitable injuries and death at the hand of the raging waters. At the very least, Camp Mystic had more than enough time to train, educate, and instruct counselors and campers alike of a true evacuation plan should the weather continue to grow in severity through the day and into the night. However, the Defendants chose to do nothing after this alert to protect Ellen's and the other campers' lives.

50. At 1:14 a.m. on Friday, July 4, 2025, the NWS predictably issued a flash flood warning for the area as the rain continued to fall, and the river continued to rise at a rapid rate. Staffers at Camp Mystic, including Dick and Tweety Eastland, received the flash flood warnings, but utterly failed to act in a timely manner to protect the lives of the girls in their care. Rather than activating a responsible evacuation plan, Dick Eastland spent time in his office on the property creating a "plan" with family members and others, and chose not to begin moving children from their cabins until approximately 2:30 a.m. At that time, many of the youngest in the camp were housed in the Bubble Inn cabin. The camp layout and cabins are pictured in the photographs below:



Copy from re:SearchTX




*Aerial View of Camp Mystic Cabins*






Copy from re:SearchTX

*Photograph from CBS News*

51. At the time evacuations finally began, the floodwaters were rising so quickly that some girls likely never had a chance based on the Camp's "plan." Instead of requesting assistance from nearby emergency responders, the Defendants and Camp Mystic decided to evacuate only one cabin at a time. This "plan" that was created and initiated more than twelve (12) hours after the first NWS alert and approximately seventy-five minutes after Camp Mystic knew of the NWS flash flood warning alert, was wholly inadequate and purposefully left some of the youngest children in Bubble Inn completely stranded without instruction, direction, or adult emergency assistance before their tragic deaths. Critical warnings from the NWS gave the Defendants ample preliminary lead times to avoid catastrophic results – lead times that allowed camps nearby to effectively evacuate and save their campers. The Defendants, instead, chose to risk the lives of young girls by failing to act promptly and efficiently when the flash flood warning was issued.

52. As the hours ticked by after the alert, the water became too deep and too strong, and the Camp's failure to act led to utter chaos and mass panic. As the water rose, campers began climbing as high as they could within the cabins to avoid the water. These attempts would be in vain, however, as the water continued to pour into the cabins, including the cabin where several girls were fighting for their lives. Campers clung onto each other, furniture, and anything they could to avoid being swept away and out of the perceived protection of their cabins. Upon information and belief, the Defendants did not even attempt to evacuate the youngest girls in Bubble Inn until before 4:00-5:00 a.m.

53. The overpowering waters cascading through the Camp finally did the inevitable by tearing children away from the roofs, doors, furniture, trees, and hands of others that they



Copy from re:SearchTX

clung to, and propelling them down the raging river into the inescapable darkness. Ellen, Linnie, Abby, Margaret, Mary, and Greta were some of the twenty-seven lives taken on July 4, 2025, at Camp Mystic. Many of their bodies were not recovered for several days.

54. The horrifying nature of these girls' untimely deaths cannot be overstated. The suffering their parents have gone through having to imagine their daughters, overcome by floodwaters, alone in the darkness, calling out for anyone to help, is more than any parent or person should be forced to bear. The undeniable pain, fear, desperation, horror, and distress the girls undoubtedly experienced in the hours and minutes before their deaths were foreseeable and preventable had Defendants acted with reasonable care for their safety. These terrifying last moments were proximately caused by the negligence and gross negligence of the Defendants. The Defendants knew that camp facilities were located in a flood zone, knew of the history of flash flooding in Kerr County, knew of repeated prior flood events at the Camp, and received multiple alerts related to the storm, but consciously chose to do nothing but rake in profits and expose children to the heightened risk of death.

### *C. The Aftermath*

55. Put simply, the devastating loss of so many young lives on July 4, 2025, was foreseeable and avoidable if proper actions were taken by the Defendants. It is clear in the aftermath of this tragedy that the Defendants were aware of the catastrophic risks that flooding at the Camp posed to human life, and despite that, they failed to develop, implement, or carry out adequate safety instructions, policies, or plans, which directly led to the deaths at the Camp.



Copy from re:SearchTX



*Douglas Getten searching Bubble Inn*

56. The Camp's written emergency instructions to campers consisted of only a single page addressing all emergencies that could arise during the camping session, with a mere seven sentences devoted to flood procedures. Camp Mystic made the conscious decision not to update its policies and procedures to prevent the death of campers despite the actual knowledge of flash flooding disasters and prior experience with necessary evacuations. Rather, the Camp maintained its seven-sentence emergency plan that provided zero aid to counselors and children during the threat of a flood. Instead, the Camp merely instructed children to await instructions over a loudspeaker, even though the Camp knew that flash floods regularly caused power failures which would render useless any loudspeaker system.

57. Unsurprisingly, on July 4th, the power did fail, so the loudspeakers could not work. The young counselors left in charge of the cabins and the children were not permitted to have their cell phones despite the known flash flood alerts the day before, and therefore, lost



Copy from re:SearchTX

all meaningful contact with adult supervisors and staff. They were then forced to make instantaneous life and death decisions for themselves and their campers on their own without proper direction or instruction. The Defendants left these teenage counselors in a vulnerable position without proper training, policies, procedures, or instruction on what to do when the inevitable occurred. Some counselors and campers resorted to primitive forms of flashlight blinking in an attempt to attract much needed help from staffers and the Eastlands.

58. Additionally, despite the location of cabins knowingly being in a flood zone and the cabins themselves flooding in prior years, Camp Mystic emergency instructions mandated that those staffers and campers in the flats "must also stay in their cabins… All cabins are constructed on high, safe locations." This statement not only creates a false sense of security in the safety of the cabins where the young girls were housed but ignores the known risk of water rising and infiltrating the cabins.



EMERGENCY INSTRUCTIONS

I. Accidents (Horse falls, falling injuries, cuts, etc.)

1. Be sure that the victim has an open airway and is breathing.
2. Do not move the victim.
3. Calm the victim.
4. Send someone for the nurse.
5. Stop bleeding with pressure directly over the injury if she has an open wound.

II. Floods

In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

*Excerpt from Camp Mystic Emergency Instructions*



Copy from re:SearchTX

59. The Defendants' conscious decision to rely on a plan that the Camp, its owners, operators, and management knew was outdated, unworkable, and incapable of protecting children in a predictable flood event illustrates a conscious indifference to the lives of the girls entrusted to their care. In the days after the horrific tragedy, the Defendants' indifference to the deaths, losses, and grieving of parents continued as Camp Mystic focused its communications and messaging on belonging removal from the Camp rather than taking responsibility for its failures. In fact, as early as 9:37 a.m. on July 5, 2025, Camp Mystic was already communicating with parents about retrieving material items, rather than accounting for their failures.

> The gates at both camps will stay open, and families are welcome to pick up belongings. Please note that all cabins on the flats and several cabins on Senior Hill experienced severe flooding. Belongings in these areas may be significantly damaged or missing. Items at Cypress Lake were unaffected by the flooding.

*Excerpt from Camp Mystic Email dated July 5, 2025*

60. Even now, inexplicably, the Camp has refused to accept an ounce of responsibility for the deaths of the counselors and children on July 4, 2025, and instead, have informed the families of the deceased girls that **Camp Mystic Cypress Lake intends to reopen for Summer 2026**.

> Camp Mystic Cypress Lake, which sustained no damage from floodwaters, will be opening in Summer 2026. Our planning and procedures will comply with the requirements of the camp safety legislation you bravely championed.

*Excerpt from Camp Mystic Communication*



Copy from re:SearchTX

61. Promoting the reopening of a for-profit camp less than a year after that camp caused the deaths of twenty-seven young girls is not only unthinkable – it is offensive to the memories of the deceased and the families and loved ones they left behind. Rather than focusing on accountability and change, Camp Mystic instead has been publicly soliciting donations to rebuild so the Defendants can go back to business as usual.


CAMP MYSTIC
HUNT TEXAS

Contributions are NOT tax deductible

**Flood Rebuild Fund**

Donate Now

Predefined Amounts:

$25.00 $50.00 $100.00

$200.00

$ Other Amount

Total: USD $ 0.00

One-time or monthly recurring donation?

Payment Type

One Time Recurring

Payment Mode

Credit Card ACH/EFT

Card Number Exp. Date CVV2

May we save your payment information on file? Yes No

*Excerpt from Camp Mystic Donation Page*

62. The actions of the Defendants after this unimaginable tragedy are appalling and unforgiveable. The Eastland Defendants present at the Camp not only initially hid the scope of the devastation and obvious deaths of multiple campers from worried parents but affirmatively attempted to provide false hope for many who were searching for their daughters.



Copy from re:SearchTX



*Matthew Pohl in Bubble Inn*

63. The mental anguish and emotional distress that many parents, including the Plaintiffs in this case, endured at the hands of the Defendants is unconscionable. Plaintiffs seek justice for their daughters, and accountability from the Defendants in this case.

## VI.

## CAUSES OF ACTION

### *A. Negligence and Gross Negligence against all Defendants*

64. Plaintiffs repeat and reallege each allegation contained above.

65. At all material times, Defendants owned, operated, managed, and controlled Camp Mystic where the underlying events took place. Camp Mystic was owned and operated by Defendant Camp Mystic, LLC, on real property owned by Defendant Natural Fountains



Copy from re:SearchTX

Properties, Inc. Defendants were personally involved in the safe operation, maintenance, and training of individuals at the Camp. These Defendants had the legal duty to keep the premises in a state consistent with due regard for the safety of its invitees, including Ellen.

66. Defendants breached the duty owed to Plaintiffs by failing to exercise ordinary care to keep the premises and the campers safe.

67. Defendants committed negligent and grossly negligent acts and omissions, including the following:

a. Failure to implement safe evacuation plans;

b. Failure to assess and monitor flood risks;

c. Failure to timely evacuate campers when flooding was foreseeable or imminent;

d. Failure to train employees and/or counselors of emergency action plans;

e. Failure to train camp counselors of emergency action plans;

f. Failure to provide lifesaving equipment;

g. Failure to ensure camp facilities were constructed in safe locations;

h. Failure to prevent the deaths of Ellen, Linnie, Abby, Margaret, Mary, and Greta;

i. Failed to adequately staff the Camp with adequately trained oversight, management, and counselors;

j. Failure to construct, install, maintain, and/or repair cabins and/or camp facilities;

k. Failure to arrange cabins in safe locations;

l. Failure to maintain marked and accessible evacuation and/or escape routes;

m. Failure to enforce policies and procedures related to safety of campers;



Copy from re:SearchTX

n. Failure to warn Plaintiffs of the dangerous condition of the camp being located in or near a known flood zone;

o. Failure to institute adequate policies and procedures that would have prevented the deaths from occurring;

p. Failure to take proper safety measures;

q. Failure to take preventative measures to eliminate known risks and hazards;

r. Violations of applicable rules, regulations, and standards;

s. Vicariously liable for the acts and omissions of their employees and agents; and

t. Other acts deemed negligent and grossly negligent.

68. As a direct and proximate result of Defendants' conduct, Ellen, Linnie, Abby, Margaret, Mary, and Greta sustained severe injuries to their bodies, which resulted in physical pain, suffering, discomfort, impairment, mental anguish, distress, fear, and death. Plaintiffs have suffered and will continue to suffer pecuniary and non-economic losses as a result of these children's deaths.

69. In addition, Plaintiffs are entitled to exemplary or punitive damages because the aforementioned actions of Defendants were grossly negligent. Defendants acted with flagrant and malicious disregard for Plaintiffs' and others' health and safety. Defendants were objectively aware of the extreme risk posed by the conditions which caused Plaintiffs' injuries, harm, and deaths but did nothing to rectify them. Defendants' acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to the girls, Plaintiffs, and others. Defendants had actual, subjective awareness of the risk and consciously disregarded the risk. Accordingly, Plaintiffs are entitled to and seek exemplary damages.



Copy from re:SearchTX

### B. *Premises Liability against all Defendants*

70. Plaintiffs repeat and reallege each allegation contained above.

71. Defendants owned, occupied, possessed, managed, and/or controlled the area where Ellen, Linnie, Abby, Margaret, Mary, and Greta sustained injuries and ultimately died. The condition of the area where Plaintiffs were injured posed an unreasonable risk of harm, and Defendants had actual knowledge or reasonably should have known of the unreasonably dangerous condition. Moreover, Plaintiffs did not have actual knowledge of the unreasonably dangerous conditions.

72. Ellen, Linnie, Abby, Margaret, Mary, and Greta were invitees who entered Defendants' premises with Defendants' knowledge and for Defendants' benefit. Defendants had a duty to either warn Plaintiffs and the girls of this unreasonably dangerous condition or make the unreasonably dangerous condition reasonably safe. Defendants breached this duty by failing to warn Plaintiffs and the girls of this known unreasonably dangerous condition and by failing to make the unreasonably dangerous condition reasonably safe. Defendants' breaches proximately caused the deaths, as well as Plaintiffs' injuries and damages.

### C. *Joint Enterprise*

73. Plaintiffs repeat and reallege each allegation contained above.

74. At all relevant times, Defendants operated in a joint enterprise because they had: (a) an express and/or implied agreement; (b) a common purpose to be carried out by the enterprise; (c) a community of pecuniary interest in that common purpose; and (d) an equal right to direct and control the enterprise. Defendants shared control of and profits from the joint operation. In addition, Defendants, as members of the joint enterprise, committed a tort



Copy from re:SearchTX

against Plaintiffs while acting within the scope of the enterprise. Therefore, Defendants are jointly and severally liable for Plaintiffs' injuries and the deaths and the damages sustained therefrom.

### *D. Respondeat Superior and Agency*

75. Plaintiffs repeat and reallege each allegation contained above.

76. At all relevant times, all agents, servants, and/or employees of Defendants were working within the course and scope of their employment for Defendants and in furtherance of Defendants' operations and business.

77. For the reasons set forth above, whenever it is alleged in this Petition that Defendants did an act or thing, it is meant that Defendants themselves or their officers, agent, and/or representatives did such act or thing. Plaintiffs therefore invoke the doctrine of *Respondeat Superior* against Defendants.

78. Further, at all relevant times, any acts and/or omissions by an agent, representative or employee of Defendants occurred within the scope of the actual and apparent authority and/or ratification of Defendants. Therefore, Defendants are liable to Plaintiffs for the acts and/or omissions of any such agent, representative or employee complained of herein by virtue of such agency relationship.

### *E. Ratification*

79. Plaintiffs repeat and reallege each allegation contained above.

80. Pleading further, Defendants are liable for the negligent acts and/or omissions of other Defendants and their agents under the doctrine of ratification. Defendants approved and accepted the location of the camp facilities, and ratified each of their negligent conduct by accepting, approving, and validating such camp facility locations with full knowledge of its



Copy from re:SearchTX

defects; by accepting its benefits and refusing and failing to repudiate such negligent conduct; and by failing to correct and make safe such facilities even after they acquired actual, subjective awareness of the risks of severe injury or death arising out of the facilities locations. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in the deaths and Plaintiffs' injuries and damages therefrom.

### *F. Joint and/Vicarious Liability*

81. Plaintiffs repeat and reallege each allegation contained above.

82. For the following reasons, the Camp Mystic Defendants' corporate forms should be disregarded to hold Defendants Tweety Eastland, Edward Eastland, Mary Liz Eastland, and Neel Bonner each vicariously or jointly liable to Plaintiffs for their wrongful conduct.

83. Upon information and belief, at all relevant times, Dick and Defendant Tweety Eastland were the Owners and Executive Directors of Camp Mystic. Defendants Edward and Mary Liz Eastland were the Directors at Camp Mystic Guadalupe River where the flooding occurred. Defendant Bonner is the President of Defendant NFP. Furthermore, Defendant Neel Bonner was the President of Defendant NFP. Defendants Tweety, Edward, Mary Liz, and Neel Bonner are collectively referred to herein as the "Individual Defendants." The Camp Mystic Defendants are mere shams, organized, and operated by the Individual Defendants in their individual capacities to perpetrate fraud upon Plaintiffs and potentially other unsuspecting persons.

84. The Individual Defendants are the "alter ego" of the Camp Mystic Defendants, as they were organized and operated as mere tools and/or business conduits for the Individual Defendants' personal benefit and advantage. The Individual Defendants organized the Camp Mystic Defendants in a way to limit their potential liability and maximize their personal gains



Copy from re:SearchTX

from the operation of these entities. The Individual Defendants have at all times exercised total dominion and control over the Camp Mystic Defendants and have exercised such control in a manner indistinguishable from their own personal affairs. The Individual Defendants perpetuated the fraud against Plaintiffs to make money, individually, from the operation of the businesses involved in this incident. The Individual Defendants were known to be the owners, president, managers and directors of the Camp Mystic Defendants, and the ones actually in control over the facilities owned by and operations of the Camp Mystic Defendants. The Individual Defendants personally benefited from making material misrepresentations to Plaintiffs.

85. The Individual Defendants are using the Camp Mystic Defendants' corporate fictions as a means of evading an existing legal obligation, namely, civil liability for negligence and gross negligence that killed Ellen, Linnie, Abby, Margaret, Mary, and Greta, injured Plaintiffs, and caused Plaintiffs to incur damages.

86. The Individual Defendants intentionally operated the Camp Mystic Defendants with inadequate capitalization. Specifically, the Individual Defendants organized their businesses with insufficient assets to satisfy potential debts and liabilities associated with running their businesses. The Individual Defendants used various companies to hold assets used at or by Camp Mystic so that those assets could not be used to satisfy any liabilities incurred by Camp Mystic. The Individual Defendants inadequately capitalized Camp Mystic to perpetuate the scheme. Then, the Individual Defendants underinsured Camp Mystic. In other words, the Individual Defendants undercapitalized Camp Mystic to limit potential liability. The Individual Defendants are attempting to avoid or limit Camp Mystic's liability for the deaths and Plaintiffs' injuries through their scheme of undercapitalizing and underinsuring the



Copy from re:SearchTX

entities—in an attempt to escape justice. Because the Individual Defendants operated Camp Mystic with inadequate capitalization, equity dictates that the Individual Defendants be held vicariously liable to Plaintiffs for all damages alleged herein.

87. The Individual Defendants, individually and through their agents, made material representations to Plaintiffs that were false when made and which the Individual Defendants knew were false or made recklessly, and/or Individual Defendants had a duty to disclose but failed to disclose material facts to Plaintiffs, knowing Plaintiffs did not know and did not have an equal opportunity to discover those facts. Specifically, the Individual Defendants made misrepresentations and/or omissions about the Camp Mystic Defendants' finances and insurance coverages, with an intent to induce Plaintiffs into allowing their daughters to attend summer camp. Plaintiffs relied to their detriment on those misrepresentations and/or omissions.

### *G. Intentional Infliction of Emotional Distress*

88. Plaintiffs repeat and reallege each allegation contained above.

89. Intentional Infliction of Emotion Distress (IIED) involves conduct that is so outrageous and extreme that it goes beyond the bounds of decency, causing severe emotional distress to the victim. In this instance, Defendants Tweety, Edward, and Mary Liz Eastland and Camp Mystic's actions were not only intentional but were reckless and constitute IIED under Texas common law. By repeatedly communicating to Plaintiffs that there was hope that their daughter was still alive even though Camp Mystic and the owners and directors knew dead bodies had been found caused Plaintiffs to experience severe distress. Defendants' continuous lies and harassing and confusing statements to Plaintiffs and others were intentionally painful, hurtful, and humiliating.



Copy from re:SearchTX

90. Defendants Tweety, Edward, and Mary Liz Eastland and Camp Mystic acted in a manner that any reasonable person would find extreme and outrageous. This conduct was carried out in full awareness of the potential for causing emotional harm, thereby satisfying the criteria for IIED.

91. The severe emotional distress inflicted on Plaintiffs was a direct result of the Defendants' outrageous conduct. The Plaintiffs have experienced significant grief, anxiety, depression, outrage, and other mental anguish as a result of the conduct.

## VII.

## DAMAGES

92. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiffs were caused to suffer severe personal injuries, bodily injury, pain, suffering, mental anguish and death.








Copy from re:SearchTX

93. Ellen was the youngest daughter of Douglas and Jennifer Getten and loved her role as a little sister. Her older sister Gwynne was her very best friend in life, and the two girls were inseparable. Ellen was beautiful from the inside out and never met a stranger. She gave every person a hug and left her presence on everyone she interacted with. Ellen loved to dance and spend time with her parents and older sister. Her happy nature affected everyone around her and will forever be remembered and missed.





94. Linnie was the only daughter of Michael and Callie McCown. She was the middle child of her two brothers, and she loved her role as the only girl sibling in the family. She had an uncanny ability to make everyone around her feel special and was known for her empathy and warm hugs. Linnie loved the people in her life with all of her heart, and her family will forever miss her.



Copy from re:SearchTX





95. Abby was the youngest daughter of Matthew and Kristin Pohl and was known for being the tiny comedian of the family. She was small but mighty, and she filled every room with warm and radiant laughter and love. While her life on Earth was far too short, her parents like to think of her in Heaven entertaining the angels until they see her again.



Copy from re:SearchTX





96. Margaret was a self-assured and independent little girl who loved to get up every morning ready to seize the day. She was the only daughter of Andrew and Ellen Sheedy and was adored by her two brothers. The Sheedy home is much quieter now without the daily sounds of Margaret's dancing footsteps and upbeat music. Her parents try to take comfort in knowing that Margaret skipped through the gates of Heaven with the same beaming smile and grace she displayed every day on Earth.



Copy from re:SearchTX





97. Mary was the oldest child of three who loved being a big sister to her younger siblings. She was a natural leader and showed love and kindness to everyone she met. She had a contagious laugh and a witty sense of humor that could never be replaced. Her parents miss her radiant smile, the sparkle in her eyes, and the pure joy she brought to her family every day.



Copy from re:SearchTX





98. Greta was a caring big sister to her little brother and a friend to everyone she met. She had a generous heart and loved helping younger children during her short time on Earth. Greta had a joy that was both fierce and gentle, and she radiated pure happiness with her infectious smile. She will forever be her parents' brightest light, and her absence leaves a void that cannot be filled.

99. Plaintiffs pray for relief and judgment as follows:

a. <u>Wrongful Death</u>

100. Plaintiffs repeat and reallege each allegation contained above.

101. Plaintiffs, on behalf of the wrongful death beneficiaries, seek to recover the following elements of damages resulting from the deaths of Ellen, Linnie, Abby, Margaret, Mary, and Greta:

- Pecuniary loss in the past and future, including but not limited to the loss of care, maintenance, guidance, nurture, support, services, advice, counsel, inheritance, and reasonable contributions of pecuniary value;



Copy from re:SearchTX

- Loss of companionship and society in the past and future, including but not limited to the loss of the positive benefits flowing from the love, comfort, companionship, and society that would have been received from Ellen, Linnie, Abby, Margaret, Mary, and Greta, had they lived;
- Mental anguish in the past and future, including but not limited to the emotional pain, torment, and suffering experienced in the past, and to be experienced in the future, because of the deaths of Ellen, Linnie, Abby, Margaret, Mary, and Greta; and,
- Any other forms of damages available to wrongful death beneficiaries.

b. <u>Survival Action.</u>

102. Plaintiffs repeat and reallege each allegation contained above.

103. Plaintiffs seek to recover the following elements of wrongful death and survival damages:

- Past and future pain and mental anguish, including the conscious physical pain and emotional pain, torment, and suffering experienced by Ellen, Linnie, Abby, Margaret, Mary, and Greta before their deaths;
- Medical expenses;
- Funeral and burial expenses; and,
- All other damages entitled to by law.

104. In addition, the actions above constitute gross negligence under Texas law and Plaintiffs are entitled to an award of exemplary damages.



Copy from re:SearchTX

105. In accordance with TEX. R. CIV. P. 47, Plaintiffs hereby state they seek monetary relief in excess of $1,000,000.00.

106. Plaintiffs have sustained substantial and irreparable harm as a direct and proximate result of Defendants' conduct. Plaintiffs seek relief in the form of all damages available under law.

## VIII.

## NOTICE OF SELF-AUTHENTICATION

107. Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiffs hereby give notice of the intent to use documents produced by any party hereto in any pretrial proceeding and at trial against the producing party.

## VIII.

## JURY TRIAL DEMAND

108. Plaintiffs hereby demand a trial by jury on all claims.

## IX.

## PRAYER

109. Plaintiffs pray that this citation issue and be served upon Defendants in a form and manner prescribed by law, requiring that Defendants appear and answer, and that upon final hearing, Plaintiffs have judgment against Defendants, both jointly and severally, in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post-judgment interests, all costs of Court, exemplary damages, and all such other and further relief, to which they may show themselves justly entitled.



Copy from re:SearchTX

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kurt Arnold*

Kurt B. Arnold
SBN: 24036150
karnold@arnolditkin.com
J. Kyle Findley
SBN: 24076382
kfindley@arnolditkin.com
Kala F. Sellers
SBN: 24087519
ksellers@arnolditkin.com
John G. Grinnan
SBN: 24087633
jgrinnan@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on May 4, 2026.

*/s/ Kyle Findley*
Kyle Findley



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Eva Castaneda on behalf of Kyle Findley
Bar No. 24076382
ecastaneda@arnolditkin.com
Envelope ID: 114463048
Filing Code Description: Amended Filing
Filing Description: PLAINTIFFS' SECOND AMENDED PETITION
Status as of 5/6/2026 10:44 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 5/4/2026 5:01:53 PM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 5/4/2026 5:01:53 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 5/4/2026 5:01:53 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 5/4/2026 5:01:53 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 5/4/2026 5:01:53 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 5/4/2026 5:01:53 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 5/4/2026 5:01:53 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 5/4/2026 5:01:53 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 5/4/2026 5:01:53 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 5/4/2026 5:01:53 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 5/4/2026 5:01:53 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 5/4/2026 5:01:53 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 5/4/2026 5:01:53 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 5/4/2026 5:01:53 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 5/4/2026 5:01:53 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 5/4/2026 5:01:53 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 5/4/2026 5:01:53 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 5/4/2026 5:01:53 PM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 5/4/2026 5:01:53 PM | SENT |
| Thomas C.Wright | | wright@wcbglaw.com | 5/4/2026 5:01:53 PM | SENT |
| Tiy Lewis | | tlewis@wcbglaw.com | 5/4/2026 5:01:53 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 5/4/2026 5:01:53 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Eva Castaneda on behalf of Kyle Findley
Bar No. 24076382
ecastaneda@arnolditkin.com
Envelope ID: 114463048
Filing Code Description: Amended Filing
Filing Description: PLAINTIFFS' SECOND AMENDED PETITION
Status as of 5/6/2026 10:44 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Joshua Fiveson | | jfiveson@wcbglaw.com | 5/4/2026 5:01:53 PM | SENT |
| Mona Reynolds | | reynolds@wcbglaw.com | 5/4/2026 5:01:53 PM | SENT |

Copy from re:SearchTX