11/10/2025 1:08 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009983
Ruben Tamez

D-1-GN-25-009983

CAUSE NO. ________________________

| | | |
|---|---|---|
| ELOISE "LULU" PECK, DECEASED, by and through TIMOTHY PECK, Individually and on Behalf of the Estate of ELOISE "LULU" PECK, DECEASED MINOR, and MELISSA PECK, Individually and on Behalf of the Estate of ELOISE "LULU" PECK, DECEASED MINOR. | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | 261ST JUDICIAL DISTRICT |
| CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND. | § | |
| *Defendants*. | § | TRAVIS COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Eloise "Lulu" Peck, Deceased, by and through Timothy Peck, Individually and on Behalf of the Estate of Eloise "LuLu" Peck, Deceased Minor, and Melissa Peck, Individually and on Behalf of the Estate of Eloise "LuLu" Peck, Deceased Minor, hereinafter referred to individually by name, or collectively as Plaintiffs, and complains of Camp Mystic, LLC, Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, Natural Fountains Properties, Inc., and Willetta Eastland hereinafter referred to individually by name or collectively as Defendants, and for cause of action would respectfully show unto the Court as follows:



Copy from re:SearchTX

## I.
## DISCOVERY CONTROL PLAN

1. Plaintiffs intend that discovery be conducted under LEVEL 3 OF RULE 190.4 of the TEXAS RULES OF CIVIL PROCEDURE.

## II.
## PARTIES

2. Plaintiff, Eloise "Lulu" Peck, Deceased, was an eight-year-old minor child residing in Dallas County, Texas. She is represented in this cause of action by and through her biological parents, Timothy and Melissa Peck.



*Figure 1 Shown Above: Photograph of Decedent, Lulu (Eloise), taken prior to her death.*

3. Plaintiff, Timothy Peck, Individually, and on Behalf of the Estate of Eloise "Lulu" Peck, Deceased Minor, is an individual residing in Dallas County, Texas.

4. Plaintiff, Melissa Peck, Individually, and on Behalf of the Estate of Eloise "Lulu" Peck, Deceased Minor, is an individual residing in Dallas County, Texas.

5. Defendant, Camp Mystic, LLC, is a domestic limited liability company whose registered office is located in Kerr County at 2689 Highway 39, Hunt, Texas 78024, and may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its



Copy from re:SearchTX

agent for service because defendant is required by the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201 to maintain a registered agent in Texas but has failed to do so.

6. Defendant, Mystic Camps Family Partnership, Ltd., is a partnership whose registered office is located in Travis County at 2404 Scenic Drive, Austin, Texas 78703, and may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because defendant is required by the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201 to maintain a registered agent in Texas but has failed to do so.

7. Defendant, Mystic Camps Management, LLC, is a domestic limited liability company whose registered office is located in Travis County at 2404 Scenic Drive, Austin, Texas 78703, and may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because defendant is required by the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201 to maintain a registered agent in Texas but has not done so.

8. Defendant, Natural Fountains Properties, Inc., is a Texas corporation whose registered office is located in Kerr County at 2689 Highway 39, Hunt, Texas 78024, and may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because defendant is required by the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201 to maintain a registered agent in Texas but has failed to do so.

9. Defendant, Willetta Eastland, is an individual residing in Travis County, Texas and may be served at her usual place of abode at 2404 Scenic Drive, Austin, Texas 78703, or wherever she may be found.

10. In the event any parties are misnamed or not included herein, Plaintiffs contend this was the result of a misidentification, misnomer, and/or such parties are or were alter egos of parties



Copy from re:SearchTX

named herein. Alternatively, Plaintiffs contend any such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## III. <br>JURISDICTION & VENUE

11. Plaintiffs allege and incorporate by reference all paragraphs referenced above for all purposes, the same as if set forth herein verbatim.

12. This Court has jurisdiction over the Defendants because they are residents of and/or do business in the State of Texas, and the amounts sought herein are within the jurisdictional limits of this court.

13. Venue is proper in Travis County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(2) because Defendant Willetta Eastland is a natural person and resides in Travis County. According to property records the property listed as her homestead exemption is located in Travis County.

14. Venue is proper in Travis County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3) because Defendant, Mystic Camps Family Partnership Ltd., is not a natural person and its principal office is located in Travis County.

15. Additionally, Defendant, Mystic Camps Management, Ltd., is not a natural person and its principal office is located in Travis County.

16. Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because Plaintiffs have established proper venue against at least one Defendant and all claims in this lawsuit arise out of the same transaction, occurrence, or series of transactions or occurrences, venue is proper in Travis County against all Defendants.



Copy from re:SearchTX

## IV. <u>FACTS</u>

17. There is no greater trust than when a parent entrusts the care of their child to another. Parents don't send their children to summer camp to die. They are told and trust that the camp will protect the child in their care and love the child as if it were their own. Camp Mystic (sometimes hereinafter referred to as the "Camp") and the people who ran it betrayed that trust. Camp Mystic's shocking betrayal of that trust caused the horrific, tragic and needless deaths of twenty-seven innocent young girls, including Eloise "Lulu" Peck. This case seeks accountability for that betrayal and to send a message to other camps – protect the kids in your care.

18. Camp Mystic is a summer camp for girls located in Kerr County, Texas, near the Guadalupe River. Richard "Dick" Eastland and Willetta Eastland were the owners and executive directors of Camp Mystic and became directly involved in operations of the Camp in 1974. The Camp had been in the family since 1939, and Richard and Willetta Eastland were the third generation to manage Camp Mystic. Since July 1932, Camp Mystic knew that cabins that housed defenseless little girls sat in the bullseye of potential flood waters from the Guadalupe River and never said a word about it to trusting parents. Since that date, Camp Mystic continued to play Russian Roulette with the lives of the little girls, disregarding what Camp Mystic knew would be an unspeakable tragedy when the flood hit those cabins.

19. On July 4, 2025, the unspeakable happened when at least twenty-seven campers and counselors from Camp Mystic were killed after, predictably, the river rapidly rose, and floodwaters swept through what Camp Mystic knew was a vulnerable and low-lying area of the Camp (hereinafter referred to as "the Incident"). Lulu Peck was among those horrifically swept away and killed.



Copy from re:SearchTX




*Figure 2 Shown Above: River of Angels memorial wall for the victims of the Texas Hill Country flood.*[1]

20. These terrifying last moments and then deaths were proximately caused by the negligence and gross negligence of Defendants. Defendants knew that Camp facilities were located in a flood zone, knew of the history of flash flooding in Kerr County, knew of repeated prior flood events at the Camp, and received warnings from family members about flood risk.

***A. Location in Flood Zone***

21. The Guadalupe-Blanco River Authority states that the Guadalupe River Basin is one of the three most dangerous regions in the entire United States for flash floods. This is the same river authority that Richard "Dick" Eastland was a board member of for several years. Camp Mystic itself has been impacted by these flash floods on numerous prior occasions placing Defendants on repeated notice of the serious and foreseeable risk of catastrophic flooding.

22. Camp Mystic's facilities were situated within, and immediately adjacent to, a known floodplain. Several of the cabins that were hit hardest in the July 2025 flood were in an area

[1] Courtesy of World Central Kitchen, CC BY 4.0 <https://creativecommons.org/licenses/by/4.0>, via Wikimedia Commons. No changes made.



Copy from re:SearchTX

identified by the Federal Emergency Management Agency (FEMA) as the highest-risk location for flooding. FEMA has different types of floodplain designations; (1) the floodway, (2) the 1% (100-year) floodplain, (3) and the 0.2% (500-year) floodplain. The floodway is the channel of a river and the adjacent land areas. In a flood event, the floodway fills with water and functions as part of the waterway and is considered the most at- risk area. The 1% (100-year) floodplain has a 1% chance of being flooded in any given year. Statistically, the 1% (100-year) floodplain event has about a 26% chance of occurring during a 30-year period. It is a misconception that the 100-year floodplain only floods once every hundred years. The 0.2% (500-year) floodplain event has a 0.2% chance of occurring every single year. Statistically this means the 0.2% (500 year) floodplain event has a 6% chance of occurring during a 30-year period. It is a misconception that the 0.2% floodplain only floods once in 500 years.

23. In the mid-2010s, Camp Mystic undertook a major multi-million-dollar expansion of its facilities, including the development of a new site known as "Cypress Lake." Additional cabins, a dining hall, recreation spaces, and other amenities were constructed in close proximity to the South Fork Guadalupe River and Cypress Creek.

24. Even as the Camp built new cabins in a less-risky flood zone elsewhere on its property, nothing was done to relocate the older buildings that were in the most danger, including the Bubble Inn Cabin where little Lulu was housed. Some of the cabins were so close to the banks of the Guadalupe River that they were considered part of the river's floodway.



Copy from re:SearchTX




*Figure 3 Shown Above: FEMA Flood map of Camp Mystic Structures*

25. Camp Mystic owners knew that its facilities were designated as being in a flood zone by FEMA but leveraged appeals to FEMA to have the "100-year floodplain" designation removed from dozens of buildings. In 2013, after an appeal from Camp Mystic, FEMA amended the flood map to remove fifteen of the Camp's Guadalupe buildings from the hazard area. In 2019 and 2020, FEMA removed fifteen more structures of the Camp's Cypress Lake facility from the designation. Although several structures were successfully removed, many of Camp Mystic's buildings remained listed on the flood designation. Camp Mystic's requests to amend the FEMA map were an attempt to hide this safety risk from the public including the campers and their parents, avoid



Copy from re:SearchTX

the requirement to carry flood insurance, lower the Camp's insurance premiums, and pave the way for expanding structures under less costly regulations. Defendants' conduct reflects a conscious decision to prioritize money and profits over the lives of children and transparency to parents.

### *B. History of Flooding*

26. In July 1932, a massive and deadly flood swept through the area surrounding the Guadalupe River, inundating Camp Mystic and its surrounding grounds. The floodwaters destroyed several of Camp Mystic's cabins, sweeping away the girls' personal belongings. At the time, campers were inside the mess hall eating lunch when the Camp director ordered them to evacuate to higher ground behind the building. Moments after the girls evacuated, floodwaters surged through the mess hall, reaching a depth of approximately one foot. It was later observed that had any of the girls attempted to exit through the mess hall's front doors, they likely would have been swept away down the slope toward the river. Although no campers lost their lives during this event, both local authorities and Camp management acknowledged that the outcome could have been far more tragic if the flooding had occurred at night. Several fatalities were reported in the surrounding area, underscoring the deadly and well documented flood risk of the region.

27. In August 1978, severe flooding killed thirty-three people in Kerr County. At Camp Mystic, the program director and staff hauled over 100 campers in station wagons to higher ground in the dead of night. Several Camp Mystic employees reported their vehicles were swept away into the Guadalupe River. Camp Mystic itself was severely damaged and was forced to suspend activities for several days. Peak discharges at several streamflow stations exceeded the historic peaks, and the flood magnitude and frequency data for the Guadalupe River indicated that this flood had a recurrence interval in excess of 100 years, or a 1% chance of an event of that magnitude occurring or being exceeded during any year.



Copy from re:SearchTX

28. In the summer of 1984, flooding once again struck the Guadalupe River in the area surrounding Camp Mystic, cutting off road access to and from the property. Rising floodwaters overtook nearby roadways, stranding campers and staff on site. During this event, Willetta Eastland experienced a medical emergency but was unable to be evacuated by ground and was ultimately forced to be airlifted from Camp Mystic by helicopter. This incident further underscores the Eastland's long-standing knowledge of the recurrent and life-threatening flood risks posed by the Guadalupe River and the surrounding terrain.

29. On July 16, 1987, just miles from Camp Mystic, a catastrophic flash flood swept through the Pot O' Gold Ranch, a Christian youth camp situated along the Guadalupe River. As severe storms pummeled the area, Pot O' Gold camp staff initiated a rushed night-time evacuation of the children. In the chaos, a bus carrying campers was overtaken by rapidly rising floodwaters. The powerful current swept the vehicle downstream, resulting in the deaths of ten young campers and injuring many others. The event made national headlines and became one of the deadliest youth-camp flood disasters in Texas history, serving as a widely publicized warning about the extreme and recurring flash-flood dangers along the Guadalupe River.

30. Additionally, in a previous legal dispute among Camp Mystic owners, minority shareholders, who were also the Eastland's family members, testified that certain parts of the property were unsuitable for recreation because "it floods."

31. All of these events eerily foreshadowed the deadly July 2025 flooding at Camp Mystic, illustrating a clear and continuing pattern of foreseeable danger that went unaddressed. Despite this clear history, Camp Mystic continued operating in the floodplain without implementing adequate warning systems, evacuation infrastructure, or modernized flood-safety protocols to protect the children in its care. The Defendants knew of the dangers of extreme flooding in the



Copy from re:SearchTX

area, but despite this knowledge, Defendants were reckless and failed to act reasonably in response to the rising water levels. These failures left campers and counselors trapped and unable to reach higher ground resulting in severe injury and death.

***C. Kerr County Warning System***

32. After the 1987 flood event, a Kerr County flood warning system was championed by then-Sheriff, Rusty Hierholzer, and later by Richard "Dick" Eastland while he sat on the board for the Upper Guadalupe River Authority. The Upper Guadalupe River Authority and others eventually developed a computer-powered system of gauges along the river and its tributaries, but by 1999, the system became outdated and was deemed unreliable. Richard "Dick" Eastland sat on the Guadalupe river's authority board and knew about the faultiness in the flood warning systems. He knew that the government warning system had become outdated and inadequate and couldn't be relied on. He advocated to the county for a new warning system shortly before the July 2025 flood, but did not take any steps to ensure that Camp Mystic had any type of warning system of its own in place for its campers.

33. Despite the absence of any official flood warning from local authorities, camp officials at Mo-Ranch, a nearby Presbyterian Camp, took swift and decisive action on their own initiative. Recognizing the rising danger, they relocated approximately seventy children and adults who had been staying overnight in a building near the river. Their proactive measures ensured the safety of all campers and staff, sparing Mo-Ranch from the devastating tragedy that struck Camp Mystic.

34. Camp Mystic's decision for its emergency flood plan to rely on outdated flood detection technology, despite knowing it was obsolete and inadequate to address current flood risks, constitutes gross negligence. By failing to implement modern safety measures or update its own



Copy from re:SearchTX

flood protocols in light of known dangers, Camp Mystic recklessly endangered the lives of the young girls entrusted to its care.

***D. Camp Mystic's Emergency Instructions***

35. Camp Mystic's emergency preparedness was grossly inadequate and demonstrated a reckless disregard for camper safety. Despite spending millions of dollars on new construction projects, Camp Mystic had limited to no flood defense. The Camp's written emergency instructions to campers consisted of only a single page addressing *all* emergencies, with a mere seven sentences devoted to flood procedures despite Camp Mystic's location being in one of the most flood-prone river corridors in Texas. By contrast, a neighboring Guadalupe River camp, which was devastated by the 1987 Pot O' Gold flood that killed ten campers, implemented detailed and comprehensive emergency protocols. Yet, Camp Mystic chose not to update or modernize its own procedures.

36. Camp Mystic's seven-sentence emergency flood plan instructed children to await instructions over a loudspeaker, even though the Camp knew that flash floods regularly caused power failures. On July 4th, the power did fail and the loudspeaker didn't work, and many teenage counselors left in charge of the dormitories lost contact with adult supervisors. They were then forced to make instant life and death decisions for themselves and their young campers on their own. Having access to little to no emergency equipment, some of the older campers resorted to shining flashlights from the cabins in an attempt to attract the attention of rescuers.

37. Additionally, despite the location of cabins knowingly being in a flood zone and the cabins themselves flooding in prior years, Camp Mystic emergency instructions advised other staff and campers to "stay in their cabins… All cabins are constructed on high, safe locations."



Copy from re:SearchTX

**CAMP MYSTIC**
**EMERGENCY INSTRUCTIONS**

**I. Accidents** (Horse falls, falling injuries, cuts, etc.)
1. Be sure that the victim has an open airway and is breathing.
2. Do not move the victim.
3. Calm the victim.
4. Send someone for the nurse.
5. Stop bleeding with pressure directly over the injury if she has an open wound.

**II. Floods**
In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

*Figure 4 Shown Above: Excerpt from Camp Mystic Emergency Instructions*

38. Thankfully, on the night of the flood some teenage counselors disregarded these emergency instructions. On the evening of July 3, 2025, into the early morning of July 4, 2025, the Giggle Box cabin housed three teenage counselors and sixteen campers, eight to ten years old. Around 2 a.m. one of the counselors saw older campers from a different cabin running to higher ground with blankets and pillows in hand. Despite this, the Giggle Box counselors were instructed by Camp staff to stay put. In a desperate attempt to obey these instructions, the counselors had their campers put their belongings on the highest bunks, put on their shoes and raincoats, and put trunks against the cabin's front door to block the water that was seeping in. One of the counselors used a porchlight her father had given her to look out the window and was shocked to see a foot of water outside. After seeing the dangerously high-water levels, she decided to disregard instructions from Camp staff and evacuated the campers through a window in the cabin. She led them all to a dry pavilion about thirty feet away. On this pavilion, they could hear screams for help from campers in a nearby cabin, but the water had risen too high and there was nothing they could do. The floodwater rose, and the girls were forced to leave the pavilion and climb up a steep rocky hill to higher ground. They had to climb higher and higher throughout the night as the water continued



Copy from re:SearchTX

to rise, until finally daylight broke and the water receded. The teenage counselors' quick, independent actions saved many lives.

39. This conscious decision to rely on a plan the Eastlands knew was outdated, unworkable, and incapable of protecting children in a predictable flood event illustrates a blatant indifference to the lives of the girls entrusted to their care.

***E. The Flood***

40. On July 2, 2025, the Texas Division of Emergency Management ("TDEM") publicly announced the activation of state emergency response resources in anticipation of significant flood threats expected over the upcoming holiday weekend. This activation was prompted by forecasts from the National Weather Service ("NWS"), which predicted that heavy rainfall would begin on July 2, 2025, and continue for several days, creating conditions likely to result in flash flooding across the region. These official warnings, issued and widely shared two days before July 4, 2025, placed Camp Mystic on clear notice of the imminent and substantial risk of flash flooding.

41. On July 3, 2025, at approximately 1:18 p.m., the National Weather Service ("NWS") issued a Flood Watch for the south-central Texas region, including Kerr County where Camp Mystic is located. This Flood Watch expressly warned that conditions were favorable for flash flooding and that the area faced an increased and specific risk of dangerous flood events. This official notice should have placed the Defendants on heightened alert, particularly given their familiarity with the region's flood risk, and their actual knowledge of how rapidly the Guadalupe River can rise on the Camp Mystic property based on prior flooding events.



Copy from re:SearchTX

42. Despite these clear warnings and their awareness of the imminent danger, Defendants failed to take reasonable precautions, including timely evacuation of campers and staff. As a result of this failure, the Defendants allowed otherwise preventable injuries and deaths to occur when the river's waters overtook the campgrounds.

43. On July 4, 2025, the predictable happened. The sudden rise of the Guadalupe River triggered additional flash flood warnings issued by the National Weather Service. Mystic prevented campers and counselors from having mobile phones while at the Camp, leaving them unable to see the emergency alerts themselves. Camp Mystic Directors, Richard "Dick" Eastland and Willetta Eastland, received the flash flood warnings but failed to act in a timely manner. Instead, on the night of the deadly flood, Richard Eastland spent time conferring with family members, some of whom lived and worked at the Camp. It was reported that Richard Eastland received the flash flood warning early at 1:14 a.m., but took until 2:30 a.m., over an hour later, to begin evacuations of their campers.

44. Camp leaders eventually ordered an evacuation, but only after the floodwaters rose to such an extreme level, that it was already too late. Even after finally acknowledging the perilousness of the situation, the directors of Camp Mystic failed to request assistance from nearby emergency responders for help. The rising floodwaters quickly outpaced the poorly planned evacuation attempt.

45. When the river rose rapidly, the floodwater swept through the cabins. The Bubble Inn and Twins cabins that housed the youngest children were hit the hardest. Lulu and the other children inside experienced extreme fear and confusion as the floodwaters entered their sleeping areas. The power failed, plunging the Camp into complete darkness as the sound of rushing water and thunder filled the air.



Copy from re:SearchTX

46. Chaos ensued as the dark water rose with alarming speed, forcing campers onto furniture and into corners in a desperate attempt to escape the cold, rising flood. As the water continued to rise, the children struggled to find safety. Several campers began piling their belongings on top of their mattresses inside a staff cabin, before their door cracked in half and flood water poured in. Some clung to one another as debris and currents tore through the cabins while others crawled onto window ledges to get to cabin rooftops. In the Bubble Inn, the children's attempts to escape were thwarted by the overpowering force of the current. Nearby survivors described hearing terrified screams and cries for help as the water overtook the cabins.

47. Some victims survived for a period of time, while trapped within the cabins, enduring prolonged physical suffering, panic, and terror as the water level rose beyond their reach. Others were pulled into the current and swept away into the darkness. These children faced the unimaginable; a slow and terrifying awareness that they were being overcome by the flood, alone in darkness, unable to reach safety. The conditions surrounding their deaths were marked by absolute horror, physical pain, and emotional distress, all of which were foreseeable and preventable had Defendants acted with even minimal care for their safety.

48. Shortly before her June 2025 Camp Mystic start date, Lulu began to fear thunderstorms, darkness, and floods. In May of 2025, she sketched those fears in her notebook, a quiet reflection of the worries that lingered in her gentle heart. That she left this world in the very way she feared most is a truth too heavy to bear.



Copy from re:SearchTX




*Figure 5 Shown Above: Excerpt from Lulu's Journal. May 2025.*



Copy from re:SearchTX

***F. The Aftermath***

49. In the aftermath of the flood, the scene at Camp Mystic was one of devastation and chaos. Parents who had entrusted their children to Camp Mystic's care were forced to wait in anguish as emergency crews underwent search and rescue efforts. The campgrounds became a disaster zone filled with debris, shattered buildings, and unbearable grief. Families, first responders, and the surrounding community were left to grapple with the horror of a tragedy that was both predictable and preventable.

50. In the days and weeks following the tragedy, the Defendants failed to take responsibility for their actions and instead sought to protect their reputation and financial interests. Even now, Defendants have refused to accept responsibility for the deaths of the young campers. Only a few months after the horrific deaths of the young girls, Camp Mystic announced that it intends to reopen for Summer 2026. The Defendants' conduct after the flood further demonstrates their conscious indifference to the safety of the children and the suffering of the families left behind.

***G. Act of God***

51. Some may claim that the flood was an unpredictable act of God, but who could rightfully claim that God willed the deaths of innocent Lulu and the other children? The flood that occurred was in no way a rare godly phenomenon. Prior flooding had occurred in the Guadalupe River basin for hundreds of years and Camp Mystic itself had experienced flooding repeatedly since its formation. The Camp's structures were in an area designated as a flood zone, because it was predicted by experts that the area would in fact flood.

52. Camp Mo-Ranch had the foresight and emergency planning to preemptively evacuate cabins prior to the July 4th flood. Even Camp Mystic's own teenage counselors recognized the imminent danger and disregarded staff directives, instead taking it upon themselves to lead



Copy from re:SearchTX

campers to higher ground, actions that undoubtedly saved their lives. In previous years under different leadership Camp Mystic experienced similar flood events and successfully evacuated campers to safety. The death of Lulu and the other campers could have been prevented if those responsible had taken even basic precautions to protect them. What happened at Camp Mystic was not divine will at all—it was human failure.

53. At the time of the Incident, Defendants Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, and Natural Fountains Properties, Inc. were entered into agreements and/or contracts with Defendant Camp Mystic, LLC and/or each other. Under the terms of the agreements Defendant Camp Mystic, LLC was given authority and responsibility to manage, supervise, and conduct all daily Camp activities.

54. Defendants Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, and Natural Fountains Properties, Inc., in whole or part or jointly, as owners and/or controllers of the land and facilities where the Camp was operated, owed a duty to ensure that the premises were maintained in a reasonably safe condition, and that the property, including its location within a flood-prone area, was adequately assessed, monitored, and equipped with protective infrastructure and emergency warning systems.

55. By delegating day-to-day operations to Camp Mystic, LLC., but retaining ownership and control over the premises, Defendants Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, and Natural Fountains Properties, Inc. shared responsibility for providing a safe environment, including ensuring that all agreements and operating procedures adequately addressed known flood risks associated with the Guadalupe River and surrounding low-lying areas.



Copy from re:SearchTX

56. At the time of the Incident, Eloise "Lulu" Peck, Deceased Minor, was on the premises by Defendants' invitation for their mutual benefit. At no time were Timothy Peck, Melissa Peck, or Lulu warned by Defendants of the dangerous condition posed by the location of the Camp facilities in/near a hazardous flood zone. Plaintiffs did not know of the condition and could not have reasonably been expected to discover it prior to the Incident. Defendants, however, did know, or reasonably should have known, of the unsafe condition in the exercise of ordinary care. Defendants' failure to disclose the known flood danger was a silent misrepresentation and material omission that induced the Pecks to entrust their child to Camp Mystic.

57. At the relevant periods of time, Defendants were negligent and/or had control of the campgrounds and/or the Camp facilities and knew or should have known of the unsafe condition. Nonetheless, Defendants failed to adequately warn Timothy Peck, Melissa Peck, or Eloise "Lulu" Peck, Deceased Minor, of the dangerous condition and failed to make the campsite reasonably safe. Instead, Defendants put profits over safety, and Plaintiffs along with Lulu, paid the ultimate price.

58. As a result of the Incident, Plaintiffs suffered injuries and damages set forth in greater detail below.

59. All claims in this lawsuit arise out of the same transaction, occurrence, or series of transactions or occurrences.



Copy from re:SearchTX

# V.
# CAUSES OF ACTION

60. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes, the same as if set forth herein verbatim.

## *A. NEGLIGENCE*

61. Defendants and their employees/agents were negligent in many ways, including failing to act as persons/entities exercising ordinarily prudent care would under the same or similar circumstances by choosing to violate rules, requirements, regulations, standards, and laws, including but not limited to the following, set out in the alternative where necessary:

(a) Failing to assess and monitor flood risks;

(b) Failing to ensure Camp facilities were constructed in safe locations;

(c) Failing to provide timely warnings and initiate evacuations when hazardous flooding was foreseeable or imminent;

(d) Failing to maintain escape routes and emergency infrastructure;

(e) Failing to implement a coordinated response plan to protect campers and staff;

(f) Failing to warn Plaintiffs and/or Eloise "Lulu" Peck, Deceased Minor, of the dangerous condition of the Camp facilities being located in a flood zone;

(g) Failing to take proper preventive measures to mitigate known risks and dangers as a reasonable person or entity would do under the same or similar circumstances;

(h) Taking improper safety measures;

(i) Negligently designing, constructing, installing, inspecting, maintaining, and/or repairing Camp facilities;

(j) Negligently managing programs, setting policies, maintaining cabins, and/or handling emergency plans;

(k) Failing to hire competent employees, agents, and/or contractors with proper qualifications, expertise, and/or training to maintain a safe environment; and

(l) Negligently hiring, training, supervising, and/or retaining employees, agents, and/or contractors; and

(m) Negligently implementing protective and evacuation procedures.



Copy from re:SearchTX

62. Vicarious liability can be imposed on Defendants under the doctrine and/or theory of nondelegable duty. When a duty is imposed by law on the basis of a concern for public safety, such as that shown and outlined herein, the party bearing the duty cannot escape it by delegating it to another, be it an employee, agent, and/or independent contractor.

63. The above acts and/or omissions were singularly and cumulatively the proximate cause of the Incident and Plaintiffs' injuries and damages therefrom.

***B. GROSS NEGLIGENCE***

64. Defendants' negligent conduct was more than momentary thoughtlessness or inadvertence. Rather, the acts and/or omissions by Defendants constitute gross negligence as that term is defined in TEX. CIV. PRAC. & REM. CODE § 41.001(11). Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiffs and/or Eloise "Lulu" Peck, Deceased Minor. Defendants had actual, subjective awareness of the risk involved but, nevertheless, proceeded with conscious indifference to the rights, safety, and welfare of Plaintiffs and/or Eloise "Lulu" Peck., Deceased Minor, and others similarly situated.

65. The above acts and/or omissions were singularly and cumulatively the proximate cause of the Incident and Plaintiffs' injuries and damages therefrom. Thus, Plaintiffs sue for exemplary damages.



Copy from re:SearchTX

### *C. Premises Liability*

66. Plaintiffs including Eloise "Lulu" Peck, Deceased Minor, were invitees of Defendants to the premises at issue.

67. Defendants were owners, occupiers, possessors, and/or managers of the premises at issue.

68. A condition or conditions of the premises posed an unreasonable risk of harm to Eloise "Lulu" Peck, Deceased Minor, and others.

69. Defendants knew or reasonably should have known of the danger that existed at the time of the Incident.

70. Defendants breached their duty of ordinary care by failing to warn Plaintiffs and/or and Eloise "Lulu" Peck, Deceased Minor, of the dangerous condition(s) and by failing to make the condition(s) reasonably safe.

71. Defendants' failure to exercise reasonable care to eliminate or reduce the risks was a proximate cause of the Incident and Plaintiffs' injuries and damages therefrom.

### *D. Joint Enterprise*

72. Defendants operated in a joint enterprise. Defendants had an agreement to operate, express or implied; a common purpose to operate and be carried out by the enterprise; a community of pecuniary interest in that common purpose; and an equal right to a voice in the direction of the enterprise, which gave them equal right to control. Defendants shared control of safety measures and shared profits from the operation. Thus, Defendants are jointly and severally liable for the Incident and Plaintiffs' injuries and damages therefrom.



Copy from re:SearchTX

### *E. Assisting & Encouraging*

73. Pleading further in the alternative if necessary, Defendants assisted and encouraged each other in committing one or more tortious acts and/or omissions as outlined above, and the assistance and encouragement was a substantial factor in causing the harm suffered by Plaintiffs. Defendants had a duty to Plaintiffs and breached that duty in the ways outlined above. Furthermore, Defendants assisted each other in the breach of the duties. Defendants knew what they were doing was a violation of the law and the standard of care. Defendants had knowledge that their actions and conduct constituted a tort, and they intended to assist each other and gave each other assistance and encouragement that was a substantial factor in bringing about the tort. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in the Incident and Plaintiffs' injuries and damages therefrom.

### *F. Assisting & Participating*

74. Pleading further in the alternative if necessary, Defendants assisted and participated with each other in causing a particular result, making Defendants responsible for the result of the united effort because the acts and/or omissions were a breach of duty and substantial factor in causing the result. Defendants' activity accomplished a tortious result. Defendants provided each other substantial assistance in accomplishing that result. Each Defendant breached a duty to Plaintiffs and/or Eloise "Lulu" Peck, Deceased Minor, as outlined above. Each Defendant's participation was a substantial factor in causing the tort resulting in the injuries and damages suffered by Plaintiffs. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in the Incident and Plaintiffs' injuries and damages therefrom.



Copy from re:SearchTX

### *G. Concert of Action*

75. Pleading further in the alternative if necessary, Defendants participated in an action that was planned, arranged, and agreed upon by each of them to further some scheme or cause, making all involved liable for the actions of one another. Defendants were negligent. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in the Incident and Plaintiffs' injuries and damages therefrom.

### *H. Ratification*

76. Pleading further in the alternative if necessary, Defendants are liable for the negligent acts and/or omissions of other Defendants and their agents under the doctrine of ratification. Defendants approved and accepted the location of the Camp facilities, and ratified each of their negligent conduct by accepting, approving, and validating such Camp facility locations with full knowledge of its defects; by accepting its benefits and refusing and failing to repudiate such negligent conduct; and by failing to correct and make safe such facilities even after they acquired actual, subjective awareness of the risks of severe injury or death arising out of the facilities locations. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in the Incident and Plaintiffs' injuries and damages therefrom.

### *I. Respondeat Superior*

77. At all times material hereto, all agents, servants and/or employees of Defendants were acting within the course and scope of employment and/or official duties. Furthermore, at all times material hereto, all agents, servants, and/or employees of Defendants were acting in furtherance of their office and/or employment and/or were the agents and/or servants of the Defendants. Defendants are therefore liable for the acts and/or omissions of their agents, servants, and/or employees under the doctrine of *respondeat superior*.



Copy from re:SearchTX

# VI.
# DAMAGES

78. As a direct and proximate result of the Incident and Defendants' negligence, recklessness, and grossly negligent conduct, Plaintiffs suffered from the death of Lulu Peck, and have sustained resulting damages.

79. Lulu was one of the most spirited and loving children one could ever meet. She was a bright light in this world, radiating warmth, curiosity, and joy. Lulu approached life with a sense of wonder that compelled her to meet, pet, and name every animal that crossed her path. To Lulu, every creature deserved a name, a story, and a place in her world. Lulu possessed a precociously sweet and joyful demeanor. She delighted in every relationship and connection, embracing each person and animal for who they were. Her boundless affection and genuine kindness drew others to her, leaving an indelible mark on everyone fortunate enough to know her. Lulu loved wholly, purely, and without hesitation; a rare and beautiful soul whose absence has left an immeasurable void in the lives of those who loved her most.



*Figure 6 Shown Above: Photograph of Lulu taken prior to the incident*



Copy from re:SearchTX

80. Plaintiffs hereby make claims for all past and future damages recoverable under Texas law and pursuant to the WRONGFUL DEATH ACT and Survival Statute, Chapter 71 of the TEXAS CIVIL PRACTICE & REMEDIES CODE, in an amount within the jurisdictional limits of the Court and which the jury deems just and fair, to include, but not limited to, the damages set forth in greater detail below.

81. Plaintiffs Timothy and Melissa Peck, Individually and on Behalf of the Estate of Eloise "Lulu" Peck, Deceased Minor, seek wrongful death damages, including but not limited to:

a. mental anguish sustained in the past;

b. mental anguish that, in reasonable probability, will be sustained in the future;

c. pecuniary loss sustained in the past;

d. pecuniary loss that, in reasonable probability, will be sustained in the future;

e. loss of companionship and society sustained in the past;

f. loss of companionship and society that, in reasonable probability, will be sustained in the future;

g. loss of household services sustained in the past;

h. loss of household services that, in reasonable probability, will be sustained in the future; and

i. exemplary damages.

82. Plaintiffs Timothy and Melissa Peck, Individually and on Behalf of the Estate of Eloise "Lulu" Peck, Deceased Minor, seek survival damages, including but not limited to:

a. physical pain sustained by Eloise "Lulu" Peck, in the past;

b. mental anguish sustained by Eloise "Lulu" Peck, in the past;

c. funeral and burial expenses;

d. loss of household services sustained in the past;

e. loss of household services that, in reasonable probability, will be sustained in the future; and

f. exemplary damages.



Copy from re:SearchTX

83. As described above, Defendants have proximately caused the Incident and Plaintiffs' damages well in excess of the minimum jurisdictional limits of this Court, and Plaintiffs request the following damages:

i. mental anguish sustained in the past;
ii. mental anguish that, in reasonable probability, will be sustained in the future;
iii. pecuniary loss sustained in the past;
iv. pecuniary loss that, in reasonable probability, will be sustained in the future;
v. loss of companionship and society sustained in the past;
vi. loss of companionship and society that, in reasonable probability, will be sustained in the future;
vii. loss of household services sustained in the past;
viii. loss of household services that, in reasonable probability, will be sustained in the future;
ix. physical pain sustained by Eloise "Lulu" Peck, Deceased Minor, in the past;
x. mental anguish sustained by Eloise "Lulu" Peck, Deceased Minor, in the past;
xi. funeral and burial expenses;
xii. punitive and exemplary damages;
xiii. pre-judgment interest;
xiv. post-judgment interest; and
xv. all other damages available to Plaintiffs under Texas law.

## VII.
## RULE 47 NOTICE

84. The Court through Rule 47 of the TEXAS RULES OF CIVIL PROCEDURE requires those seeking affirmative relief to plead the amount of damages sought, despite the fact that Plaintiffs want the jury to decide the amount of the verdict. Therefore, only because the Court requires this statement, Plaintiffs at this time seek monetary relief in excess of ONE MILLION DOLLARS ($1,000,000.00), but Plaintiffs intend to leave the determination of the verdict amount to the jury.



Copy from re:SearchTX

## VIII.
## PRESERVATION OF EVIDENCE

85. Plaintiffs hereby demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Incident made the basis of this lawsuit, or the damages resulting therefrom. These requests and demands include but are not limited to preserving and maintaining all parts of the site of the Incident, the campsite, signs, statements, photographs, video footage, audio, surveillance, security footage, information, business records, incident reports, equipment (e.g., safety equipment, including weather monitoring equipment, etc.), invoices, checks, correspondence, facsimile, email, voice-mail, text messages and any evidence whatsoever involving or relating to the Incident in question. These requests and demands also include preservation of the scene of the Incident. Failure to preserve and maintain such evidence will constitute spoliation of evidence, and Plaintiffs will seek appropriate relief from the Court for any such spoliation.

## IX.
## NOTICE OF SELF-AUTHENTICATION

86. Pursuant to Rule 193.7 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs give notice of intent to use documents produced by any party hereto in any pretrial proceeding and at trial against the producing party.

## X.
## DEMAND FOR JURY TRIAL

87. Plaintiffs hereby demand a jury trial in this matter. Plaintiffs acknowledge payment on this date of the required jury fee.



Copy from re:SearchTX

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants be cited to appear and answer, and on final trial hereafter, the Plaintiffs have judgment against Defendants in an amount within the jurisdictional limits of this Court, together with all pre-judgment and post-judgment interest as allowed by law, costs of Court, and for such other and further relief to which Plaintiffs may be justly entitled by law and equity, including, but not limited to:

a. Actual damages within the jurisdictional limits of this Court;

b. Exemplary damages;

c. Pre-judgment and post-judgment interest at the maximum rates allowed by law;

d. Costs of court; and

e. Such other and further relief of any kind to which Plaintiff may show themselves justly entitled.

Dated: November 10, 2025

Respectfully submitted,

HOWRY BREEN & HERMAN, L.L.P.

Randy R. Howry / SBN: 10121690
rhowry@howrybreen.com
Sean E. Breen / SBN: 00783715
sbreen@howrybreen.com
1900 Pearl Street
Austin, Texas 78705
512.474.7300 / 512.474.8557 (f)

TEFTELLER LAW, PLLC

*/s/ Jarom Tefteller, with permission*

Jarom Tefteller / SBN: 24060705
jt@tlaw-pllc.com
403 W. Tyler Street
Gilmer, Texas 75644



Copy from re:SearchTX

903.843.5678 / 903.680.2310 (f)

- and -

THE ARMSTRONG FIRM, PLLC

/s/ Ron Armstrong, II, with permission
Ron Armstrong, II / SBN: 24059394
rwaii@tafpllc.com
109 Yoalana St., Suite 210
Boerne, Texas 78006
210.277.0542 / 210.277.0548 (f)

*Attorneys for Plaintiffs Timothy and Melissa Peck, Individually and on Behalf of the Estate of Eloise "Lulu" Peck, Deceased Minor*



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Caitlin Baker on behalf of Randy Howry
Bar No. 10121690
cbaker@howrybreen.com
Envelope ID: 107864057
Filing Code Description: Petition
Filing Description: PLAINTIFF'S ORIGINAL PETITION
Status as of 11/12/2025 3:44 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Caitlin Baker | | cbaker@howrybreen.com | 11/10/2025 1:08:58 PM | SENT |
| Randy Howry | | rhowry@howrybreen.com | 11/10/2025 1:08:58 PM | SENT |
| Sean EBreen | | sbreen@howrybreen.com | 11/10/2025 1:08:58 PM | SENT |
| Roni Wilson | | rwilson@howrybreen.com | 11/10/2025 1:08:58 PM | SENT |
| Jarom Tefteller | 24060705 | jt@tlaw-pllc.com | 11/10/2025 1:08:58 PM | SENT |
| Ronald Armstrong | 24059394 | rwaii@tafpllc.com | 11/10/2025 1:08:58 PM | SENT |

Copy from re:SearchTX